IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                        CASE NO. 07-80998-CIV-RYSKAMP/VITUNAC

JOHN KORMAN, *et al.,*

     Defendants.

_____/

## AURORA'S ANSWERS TO KORMANS' FIRST SET OF INTERROGATORIES

Defendant, Aurora Loan Services ("Aurora"), hereby responds to Defendants, John Korman and Pamela Korman (the "Kormans") First Set of Interrogatories (the "Interrogatories"), as follows:

### GENERAL OBJECTIONS

Aurora objects to the Interrogatories to the extent they require disclosure of attorney-client communications or attorney work product.

As to the correspondingly numbered Interrogatories, Aurora states:

### PRELIMINARY STATEMENT

The answers to the Interrogatories (the "Answers") were prepared after reasonably diligent inquiry by Aurora for the information requested. The Answers are based upon such information as was readily available to Aurora, and Aurora expressly reserves the right, without imposing on it any duty not required by the Florida Rules of Civil

Page 1 of 7

Procedure, to revise, correct, add to or clarify the Answers when and if additional information comes to its attention.

Aurora does not concede the relevance or materiality of any of the Interrogatories or Answers, nor the subject matter to which the Interrogatories refer, or that any Answer is or will be admissible evidence in this action. Aurora also does not waive any objection, whether or not asserted herein, to the use of the Answers in this action.

Aurora does not waive any privilege or immunity from disclosure, including, without limitation, the attorney-client privilege, the accountant-client privilege, the joint defense or common interest exception to waiver of privilege, or the work product doctrine, which may attach to the information responsive to the Interrogatories.

## ANSWERS

In addition to the General Objections and the Preliminary Statement, which are incorporated by reference into each of the Answers set forth below, Aurora further responds to the correspondingly numbered Interrogatories, as follows:

## INTERROGATORIES

1.     State the full name, current address, and telephone number of each and every person providing answers to these interrogatories in whole or in part and your relationship to the Plaintiff or Defendants in this case, listed herein above within the Caption.

### ANSWER:

Laura McCann
Cindy Wallace
Aurora Loan Services, LLC
10350 Park Meadows Drive
Littleton, CO 80124

2.      Are you the note holder?

**ANSWER:**

Yes

3.      Do you currently possess the original note containing the once wet ink signature of John Korman?

**ANSWER:**

Yes

4.      Was the original note containing the once wet ink signature of John Korman ever under your care, custody or control?  If your answer is yes, under what circumstances, furthermore you are to identify any relevant documents.

**ANSWER:**

Yes.

5.      Do you or did you ever have any rights under the Mortgage-Loan, excluding the right to collect the monthly payments?

If you do have additional rights, other than the right to collect the monthly payments, please explain, and you are to identify the document of authority, presumptively filed with the Clerk of the Court, by counsel for Aurora on June 18, 2008, under this title, herein-above.

If you do not have any additional rights, other than the right to collect monthly payments, and no document filed with the Clerk of the Court to date would show otherwise, please explain the rationale with your filing on June of 2008 by the law firm of Awerbach & Cohn, representing Aurora Loan Services, as opposed to a Motion for Dismissal (as Defendant in Error)?

**ANSWER:**

Yes.  Aurora refers to the note and mortgage which sets forth the rights and obligations between the parties.


6.   To the best of your knowledge, who is the note holder?

**ANSWER:**

Aurora Loan Services, LLC


7.   Counsel for Aurora Loan Services filed with the Clerk of the Court, June 18, 2008, mortgage documents to be exhibited, which did not include the document discharging the note between John Korman and Lehman Brothers Bank, duly recorded on June 5, 2008, why not?

**ANSWER:**

The documents filed by Aurora's counsel on June 18, 2008 were only those documents relevant to Aurora's affirmative defense of subrogation.  Moreover, it is Aurora's position that the note and mortgage have not been discharged.


8.   Do you recognize the herein attached letter addressed to

Michael Cohn
Awerbach & Cohn, P.A.
2600 McCormick Drive, Suite 100
Clearwater, FL 33759
(Counsel for Aurora Loan Services)
Certified Mail #7007 2560 0002 4034 8569

**ANSWER:**

No.

Page 4 of 7

Exhibit A, 4 of 9

9.      Did you respond to this herein attached letter, if you did, you are to identify the document and provide a copy, however, if you did not respond, why not?

Please note, I now know the letter holds many inaccuracies, and for some reason you failed to correct my ignorance. I'll go along with that, what other than that, if anything justified the lack of response on your part?

### ANSWER:

No.  The letter did not call for a response.

10.     Would it be fair to characterize one area of the mortgage-loan between the parties, namely John Korman and Aurora Loan Service as when the payments have been estopped by operation of law, or public policy, that the function of Aurora Loan Services which was once employed under this herein mortgage-loan (characterized) "as being terminated?"

If the answer is no, please explain and you are to all identify documents pursuant to your answer.

### ANSWER

No.  The payments under the note and mortgage have not been estopped by operation of law or public policy.

11.     Is Aurora Loan Services licensed to operate a business in Florida?

If your answer is yes, you are to identify documents pursuant to that authority.

### ANSWER:

Aurora Loan Services is a wholly owned subsidiary of Lehman Brothers Bank, FSB and is not subject to state licensing.

12.     Was Aurora Loan Services ever contacted by the Internal Revenue Service in reference to this instant herein mortgage application, or any time thereafter, which occurred prior to the filing of this instant action, if yes, please explain briefly and you are to identify the documents sought and any communications that may have occurred and between whom.

**ANSWER:**

No.

13.     You are to identify the person working for Aurora Loan Services that authorized this action to continue as a Defendant (in error), without objection, and under what premise was this action allowed to continue, or identify the lawful authority vested within, as being the real party in interest?

**ANSWER**

Aurora is the assignee of the mortgage, pursuant to the Corporate Assignment of Mortgage attached hereto.

14.     What do you know about the Tax Levy that was served bearing the name of John Korman?

**ANSWER:**

Nothing other than what is stated in the Notice of Federal Tax Lien.

Aurora Loan Services

By _Laura McCann_

Its _AVP, Default_

STATE OF ~~FLORIDA~~ Colorado
COUNTY OF Douglas

Before me, the undersigned authority, personally appeared

_Laura McCann_ , as the _Assistant Vice President_ of Aurora Loan

Services, who is personally known to me or who has produced _Drivers License_ for

identification, and who after being duly sworn states that the above and foregoing

Answers to Interrogatories are true and correct.

Dated this 12th day of December, 2008.

THADDEUS LARIMER
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 3-7-2012

sign _Thaddeus Larimer_

print _Thaddeus Larimer_
Notary Public
My commission expires: 3-7-2012
Commission No. N/A

FALFT\07.267\Discovery\Ans2Interrogs.doc

Page 7 of 7

Exhibit A, 7 of 9

Recording Requested By:
AURORA LOAN SERVICES

When Recorded Return To:

Joann Rein
AURORA LOAN SERVICES
P.O. Box 1706
Scottsbluff, NE 69363-1706

---

### CORPORATE ASSIGNMENT OF MORTGAGE

Palm Beach, Florida
SELLER'S SERVICING #:0039153879 "KORMAN"

MERS #: 100025440003395368 VRU #: 1-888-679-6377

Date of Assignment: July 9th, 2008
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR LEHMAN BROTHERS
BANK, FSB, A FEDERAL SAVINGS BANK IT'S SUCCESSORS AND ASSIGNS at P.O. BOX 2026, G4318 MILLER
ROAD, FLINT, MI 48501-2026
Assignee: AURORA LOAN SERVICES LLC at 2617 COLLEGE PARK, PO BOX 1706, SCOTTSBLUFF, NE 69361
Executed By: JOHN J KORMAN, A MARRIED MAN, JOINED BY HIS SPOUSE, PAMELA KORMAN To:
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR LEHMAN BROTHERS BANK,
FSB, A FEDERAL SAVINGS BANK
Date of Mortgage: 09/29/2006 Recorded: 10/11/2006 in Book/Reel/Liber: 20949 Page/Folio: 0270 as Instrument
No.: 20060576615 in Palm Beach, Florida

Property Address: 934 SW 21ST WAY, BOCA RATON, FL 33486

Legal: LOT 8, BLOCK 7, BRAMALEA UNICORP, BOCA RATON - SECOND ADDITION P.U.D., ACCORDING TO
MAP OR PLAT THEREOF AS RECORDED IN PLAT BOOK 47, PAGE 139 OF THE PUBLIC RECORDS OF PALM
BEACH COUNTY, FLORIDA.

   KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN and NO/100ths DOLLARS and
other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is
hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage
together with the Note or other evidence of indebtedness (the "Note"), said Note having an original principal sum of
$650,000.00 with interest, secured thereby, together with all moneys now owing or that may hereafter become due
or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein
contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial
interest under the Mortgage.

   TO HAVE AND TO HOLD the said Mortgage and Note, and also the said property unto the said Assignee forever,
subject to the terms contained in said Mortgage and Note.

   MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR LEHMAN BROTHERS BANK,
FSB, A FEDERAL SAVINGS BANK IT'S SUCCESSORS AND ASSIGNS
On July 9th, 2008

By: _____
JOANN REIN, Vice President

WITNESS                                    WITNESS

_____                  _____
JANIE FLORES                               SUSAN LINDHORST

*JLR*JLHALSI*07/08/2008 09:49:37 AM* ALSI01ALSIA0000000000000000494263* FLPALM* 0039153879 FLSTATE_MORT_ASSIGN_ASSN **JLHALSI*

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

STATE OF Nebraska
COUNTY OF Scotts Bluff

ON July 9th, 2008, before me, DARLINE DIETZ, a Notary Public in and for the County of Scotts Bluff County, State of Nebraska, personally appeared JOANN REIN, Vice President, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Darline Dietz_
DARLINE DIETZ
Notary Expires: 03/22/2010

GENERAL NOTARY-State of Nebraska
DARLINE DIETZ
My Comm. Exp. March 22, 2010

(This area for notarial seal)

Prepared By:   Joann Rein, AURORA LOAN SERVICES 2617 COLLEGE PARK, PO BOX 1706, SCOTTSBLUFF, NE 69363-1706 308-635-3500

*JLR*JLHALSI*07/09/2008 09:48:37 AM* ALSI01ALSI400000000000000004H263* FLP*ALM* 0039153879 FLSTATE_MORT_ASSIGN_ASSN **JLHALSI*

Exhibit A, pg 9 of 9

John Korman
934 SW 21 Way
Boca Raton Florida 33486
561.393.0773
korman2001@comcast.net

Aurora Loan Services                                          April 17th, 2008
10350 Park Meadows Drive
Littleton, CO 80124
720.945.3000
800.880.0128

Registered Mail # 7007 2560 0002 4034 8545

Account # 0039153879

Dear Melissa Ramirez;

Thank you for your letter dated April 8th 2008, wherein you state being
regulated by the Office of Thrift Supervision. This Office is associated with
the "Department of the Treasury." Could you be so kind as to identify this
"Department of the Treasury?" The reason for my question is simply this;
The United States of America has not had a Treasury since the 1930's.
Which Treasury is Aurora Loan Services a member of?

Furthermore, you claim to be something other than a Collection Agency. Are
you the lender? Are you a Collection Agency acting as the arm of the
lender?

What I am asking is for Disclosure as to who loaned me what. I pay a
company called Aurora Loan Services, which is a collection agency but
apparently borrowed money from a Bank called the LEHMAN BROTHERS
BANK FSB. Is Aurora Loan Services and LEHMAN BROTHERS BANK
FSB the same entity by ownership?

In the event that Aurora Loan Services is a separate corporation that is acting
in the capacity collecting debts for a third party, it is incumbent upon you
pursuant to the Fair Debt Collection Practices Act, **15 USC 1692g Sec. 809
(b)** that your claim to be the NOTE HOLDER is disputed, therefore the

Exhibit B, pg 1 of 3

payee being Aurora Loan Services Inc., is disputed and validation is requested.

The undersigned is not requesting "verification" or proof of his mailing address, but a request for VALIDATION made pursuant to the above named Title and Section. I respectfully request that your offices provide me with competent evidence that I have any legal obligation to pay you as the NOTE HOLDER of the "mortgage."

In the event Aurora Loan Services and LEHMAN BROTHERS BANK FSB is the same entity byway of ownership, please verify my debt. Who or what loaned the money to buy my home?

I am in receipt of your letter wherein I see a document entitle NOTE. Who is the NOTE HOLDER? Who is the Lender? I do not have any documents that contain the Lender's signature, why?

Please provide me with the following;
Complete disclosure pursuant to **15 USC 1692g,** including but not limited to;
That you are licensed to collect in my state, all Debt Collectors must be licensed to collect debts within Florida.
Provide me with your license numbers and Registered Agent. Your failure to provide this information will result in a letter to The Federal Trade Commission to investigate your allegations.

Furthermore it has come to my attention that you apparently are withholding our payments past the pay date in order to generate a late fee. This practice is illegal. Two days ago the post offices around the country remained open until midnight so that the taxpayers might postmark their income taxes before the deadline. That postmark is the legal "hand-off" whereby Aurora received that payment. I can not be held responsible for your inefficiency. Kindly remove all of the late payments from this account.

In the event I do not hear from you in the next thirty days I will assume the note has been sold or has been bundled and pledged as a security, also that Aurora Loan Services is a debit Collector for its principal LEHMAN BROTHERS BANK FSB and not the owner of the Note.

I would greatly appreciate your compliance with my request.

Exhibit B, pg 2 of 3

John Korman

LII.88/12/18.18:16:57.81573

Note; Emphasis added to this affidavit with Yellow Highlighting!

## STATE OF MICHIGAN

### IN THE CIRCUIT COURT/FOR THE COUNTY OF OAKLAND

|  |  |  |
|---|---|---|
| BANK ONE, N.A., | ) | Case No. 03-047448-CZ |
| | ) | |
| Plaintiff, | ) | Hon. E.. Sosnick |
| | ) | |
| v. | ) | AFFIDAVIT OF WALKER F. TODD, |
| | ) | EXPERT WITNESS FOR DEFENDANTS |
| HARSHAVARDHAN DAVE and | ) | |
| PRATIMA DAVE, jointly and severally, | ) | |
| | ) | |
| Defendants. | ) | |

OAKLAND COUNTY 03-047448-CZ

JUDGE EDWARD SOSNICK
BANK ONE   v   DAVE.HARSHABA

---

Harshavardhan Dave and Pratima H. Dave
C/o 5128 Echo Road
Bloomfield Hills, MI 48302
Defendants, *in propria persona*

Michael C. Hammer (P41705)
Ryan O. Lawlor (P64693)
Dickinson Wright PLLC
Attorneys for Bank One, N.A.
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
(313) 223-3500

---

Now comes the Affiant, Walker F. Todd, a citizen of the United States and the State of

Ohio over the age of 21 years, and declares as follows, under penalty of perjury:

1.  That I am familiar with the Promissory Note and Disbursement Request and

Authorization, dated November 23, 1999, together sometimes referred to in other

documents filed by Defendants in this case as the "alleged agreement" between

Defendants and Plaintiff but called the "Note" in this Affidavit. If called as a Witness,

I would testify as stated herein.  I make this Affidavit based on my own personal

knowledge of the legal, economic, and historical principles stated herein, except that I

have relied entirely on documents provided to me, including the Note, regarding

Exhibit C, pg 1 of 15

certain facts at issue in this case of which I previously had no direct and personal knowledge. I am making this affidavit based on my experience and expertise as an attorney, economist, research writer, and teacher. I am competent to make the following statements.

## PROFESSIONAL BACKGROUND QUALIFICATIONS

2. My qualifications as an expert witness in monetary and banking instruments are as follows. For 20 years, I worked as an attorney and legal officer for the legal departments of the Federal Reserve Banks of New York and Cleveland. Among other things, I was assigned responsibility for questions involving both novel and routine notes, bonds, bankers' acceptances, securities, and other financial instruments in connection with my work for the Reserve Banks' discount windows and parts of the open market trading desk function in New York. In addition, for nine years, I worked as an economic research officer at the Federal Reserve Bank of Cleveland. I became one of the Federal Reserve System's recognized experts on the legal history of central banking and the pledging of notes, bonds, and other financial instruments at the discount window to enable the Federal Reserve to make advances of credit that became or could become money. I also have read extensively treatises on the legal and financial history of money and banking and have published several articles covering all of the subjects just mentioned. I have served as an expert witness in several trials involving banking practices and monetary instruments. A summary biographical sketch and resume including further details of my work experience, readings, publications, and education will be tendered to Defendants and may be made available to the Court and to Plaintiff's counsel upon request.

## GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

Exhibit C, pg 2 of 15

LII.08/12/10.10:16:57.01575

3.  Banks are required to adhere to Generally Accepted Accounting Principles (GAAP). GAAP follows an accounting convention that lies at the heart of the double-entry bookkeeping system called the Matching Principle.  This principle works as follows: When a bank accepts bullion, coin, currency, checks, drafts, promissory notes, or any other similar instruments (hereinafter "instruments") from customers and deposits or records the instruments as assets, it must record offsetting liabilities that match the assets that it accepted from customers.  The liabilities represent the amounts that the bank owes the customers, funds accepted from customers.  In a fractional reserve banking system like the United States banking system, most of the funds advanced to borrowers (assets of the banks) **are created by the banks themselves** and are not merely transferred from one set of depositors to another set of borrowers.

## RELEVANCE OF SUBTLE DISTINCTIONS ABOUT TYPES OF MONEY

4.  From my study of historical and economic writings on the subject, I conclude that a common misconception about the nature of money unfortunately has been perpetuated in the U.S. monetary and banking systems, especially since the 1930s.  In classical economic theory, once economic exchange has moved beyond the barter stage, there are two types of money:  money of *exchange* and money of *account*.  For nearly 300 years in both Europe and the United States, confusion about the distinctiveness of these two concepts has led to persistent attempts to treat money of account as the equivalent of money of exchange.  In reality, especially in a fractional reserve banking system, a comparatively small amount of money of exchange (e.g., gold, silver, and official currency notes) may support a vastly larger quantity of business transactions denominated in money of account.  The sum of these transactions is the sum of credit extensions in the economy.  With the exception of

Exhibit C, pg 3 of 15

LII 98/12/18.18:16:57.01576

customary stores of value like gold and silver, the monetary base of the economy largely consists of credit instruments. __Against this background, I conclude that the Note, despite some language about "lawful money" explained below, clearly contemplates both disbursement of funds and eventual repayment or settlement in money of account (that is, money of exchange would be welcome but is not required to repay or settle the Note).__ The factual basis of this conclusion is the reference in the Disbursement Request and Authorization to repayment of $95,905.16 to Michigan National Bank from the proceeds of the Note. That was an exchange of the credit of Bank One (Plaintiff) for credit apparently and previously extended to Defendants by Michigan National Bank. Also, there is no reason to believe that Plaintiff would refuse a substitution of the credit of another bank or banker as complete payment of the Defendants' repayment obligation under the Note. This is a case about exchanges of money of account (credit), not about exchanges of money of exchange (lawful money or even legal tender).

5. Ironically, the Note explicitly refers to repayment in "lawful money of the United States of America" (*see* "Promise to Pay" clause). Traditionally and legally, Congress defines the phrase "lawful money" for the United States. Lawful money was the form of money of exchange that the federal government (or any state) could be required by statute to receive in payment of taxes or other debts. Traditionally, as defined by Congress, lawful money only included gold, silver, and currency notes redeemable for gold or silver on demand. In a banking law context, lawful money was only those forms of money of exchange (the forms just mentioned, plus U.S. bonds and notes redeemable for gold) that constituted the reserves of a national bank prior to 1913 (date of creation of the Federal Reserve Banks). *See, Lawful Money,*

Exhibit C, pg 4 of 15

LII.00/12/10.10:16:57.01577

*Webster's New International Dictionary* (2d ed. 1950).   **In light of these facts, I conclude that Plaintiff and Defendants exchanged reciprocal credits involving money of account and not money of exchange; no lawful money was or probably ever would be disbursed by either side in the covered transactions.**   This conclusion also is consistent with the bookkeeping entries that underlie the loan account in dispute in the present case.   Moreover, it is puzzling why Plaintiff would retain the archaic language, "lawful money of the United States of America," in its otherwise modern-seeming Note.   It is possible that this language is merely a legacy from the pre-1933 era.   Modern credit agreements might include repayment language such as, "The repayment obligation under this agreement shall continue until payment is received *in fully and finally collected funds*," which avoids the entire question of "In what form of money **or credit** is the repayment obligation due?"

6.   *Legal tender,* a related concept but one that is economically inferior to *lawful money* because it allows payment in instruments that cannot be redeemed for gold or silver on demand, has been the form of money of exchange commonly used in the United States since 1933, when domestic private gold transactions were suspended (until 1974)..   Basically, legal tender is whatever the government says that it is.   The most common form of legal tender today is Federal Reserve notes, which by law cannot be redeemed for gold since 1934 or, since 1964, for silver.   *See,* 31 U.S.C. Sections 5103, 5118 (b), and 5119 (a).

Note: I question the statement that fed reserve notes cannot be redeemed for silver since 1964. It was Johnson who declared on 15 Marcy 1967 that after 15 June 1967 that Fed Res Notes would not be exchanged for silver and the practice did stop on 15 June

Exhibit C, pg 5 of 15

LII.88/12/19.18:16:57.01578

1967 – not 1964. I believe this to be error in the text of the author's affidavit.

7. *Legal tender under the Uniform Commercial Code (U.C.C.)*, Section 1-201 (24) (Official Comment), is a concept that sometimes surfaces in cases of this nature.. The referenced Official Comment notes that the definition of *money* is not limited to *legal tender* under the U.C.C. *Money* is defined in Section 1-201 (24) as "a medium of exchange authorized or adopted by a domestic or foreign government and includes a monetary unit of account established by an intergovernmental organization or by agreement between two or more nations." The relevant Official Comment states that "The test adopted is that of sanction of government, whether by authorization before issue or adoption afterward, which recognizes the circulating medium as a part of the official currency of that government. The narrow view that money is limited to legal tender is rejected." Thus, I conclude that the U.C.C. tends to validate the classical theoretical view of money.

HOW BANKS BEGAN TO LEND THEIR OWN CREDIT INSTEAD OF REAL MONEY

8.   In my opinion, the best sources of information on the origins and use of credit as money are in Alfred Marshall, MONEY, CREDIT & COMMERCE 249-251 (1929) and Charles P. Kindleberger, A FINANCIAL HISTORY OF WESTERN EUROPE 50-53 (1984). A synthesis of these sources, as applied to the facts of the present case, is as follows:  As commercial banks and discount houses (private bankers) became established in parts of Europe (especially Great Britain) and North America, by the mid-nineteenth century they commonly made loans to borrowers by extending their own *credit to the borrowers or, at the borrowers' direction, to third parties. The* typical form of such extensions of credit was drafts or bills of exchange drawn upon themselves (claims on the credit of the drawees) instead of disbursements of bullion,

LII.98/12/18.18:16:57.81579

coin, or other forms of money.  In transactions with third parties, these drafts and bills came to serve most of the ordinary functions of money.  The third parties had to determine for themselves whether such "credit money" had value and, if so, how much.  The Federal Reserve Act of 1913 was drafted with this model of the commercial economy in mind and provided at least two mechanisms (the discount window and the open-market trading desk) by which certain types of bankers' credits could be exchanged for Federal Reserve credits, which in turn could be withdrawn in lawful money.  Credit at the Federal Reserve eventually became the principal form of monetary reserves of the commercial banking system, especially after the suspension of domestic transactions in gold in 1933.  Thus, credit money is not alien to the current official monetary system; it is just rarely used as a device for the creation of Federal Reserve credit that, in turn, in the form of either Federal Reserve notes or banks' deposits at Federal Reserve Banks, functions as money in the current monetary system.  In fact, a means by which the Federal Reserve expands the money supply, loosely defined, is to set banks' reserve requirements (currently, usually ten percent of demand liabilities) at levels that would encourage banks to extend new credit to borrowers on their own books that third parties would have to present to the same banks for redemption, thus leading to an expansion of bank-created credit money.  In the modern economy, many non-bank providers of credit also extend book credit to their customers without previously setting aside an equivalent amount of monetary reserves (credit card line of credit access checks issued by non-banks are a good example of this type of credit), which also causes an expansion of the aggregate quantity of credit money.  The discussion of money taken from Federal Reserve and other modern sources in paragraphs 11 et seq. is consistent with the account of the

Exhibit C, pg 7 of 15

LII.98/12/18.18:16:57.81589

origins of the use of bank credit as money in this paragraph.

## ADVANCES OF BANK CREDIT AS THE EQUIVALENT OF MONEY

9.  Plaintiff apparently asserts that the Defendants signed a promise to pay, such as a
    note(s) or credit application (collectively, the "Note"), in exchange for the Plaintiff's
    advance of funds, credit, or some type of money to or on behalf of Defendant.
    However, the bookkeeping entries required by application of GAAP and the Federal
    Reserve's own writings should trigger close scrutiny of Plaintiff's apparent assertions
    that it lent its funds, credit, or money to or on behalf of Defendants, thereby causing
    them to owe the Plaintiff $400,000.  According to the bookkeeping entries shown or
    otherwise described to me and application of GAAP, the Defendants allegedly were
    to tender some form of *money* ("lawful money of the United States of America" is the
    type of money explicitly called for in the Note), securities or other capital equivalent
    to money, funds, credit, or something else of value in exchange (money of exchange,
    loosely defined), collectively referred to herein as "money," to repay what the
    Plaintiff claims was the *money* lent to the Defendants.  **It is not an unreasonable**
    **argument to state that Plaintiff apparently changed the economic substance of**
    **the transaction from that contemplated in the credit application form,**
    **agreement, note(s), or other similar instrument(s) that the Defendants executed,**
    **thereby changing the costs and risks to the Defendants.**  At most, the Plaintiff
    extended its own *credit* (money of account), but the Defendants were required to
    repay in *money* (money of exchange, and *lawful money* at that), **which creates at**
    **least the inference of inequality of obligations** on the two sides of the transaction
    (*money*, including *lawful money*, is to be exchanged for *bank credit*).

MODERN AUTHORITIES ON MONEY

Exhibit C, pg 8 of 15

LLL.88/12/10.10:16:57.01581

11. To understand what occurred between Plaintiff and Defendants concerning the alleged
loan of *money* or, more accurately, *credit*, it is helpful to review a modern Federal
Reserve description of a bank's lending process. *See*, David H. Friedman, MONEY
AND BANKING (4th ed. 1984)(apparently already introduced into this case): "The
commercial bank lending process is similar to that of a thrift in that the receipt of cash
from depositors increases both its assets and its deposit liabilities, which enables it to
make additional loans and investments. . . .  When a commercial bank makes a
business loan, it accepts as an asset the borrower's debt obligation (the promise to
repay) and creates a liability on its books in the form of a demand deposit in the
amount of the loan." (Consumer loans are funded similarly.)  Therefore, the bank's
*original bookkeeping entry should show an increase in the amount of the asset
credited on the asset side of its books and a corresponding increase equal to the value
of the asset on the liability side of its books.*  **This would show that the bank
received the customer's signed promise to repay as an *asset*, thus *monetizing* the
customer's signature and creating on its books a liability in the form of a
demand deposit or other demand liability of the bank.**  The bank then usually
would hold this demand deposit in a transaction account on behalf of the customer.
Instead of the bank lending its *money* or other assets to the customer, as the customer
reasonably might believe from the face of the Note, the bank *created* funds for the
customer's transaction account without the customer's permission, authorization, or
knowledge and delivered the *credit* on its own books representing those funds to the
customer, meanwhile alleging that the bank lent the customer *money*.  If Plaintiff's
response to this line of argument is to the effect that it acknowledges that it lent credit
or issued credit instead of money, one might refer to Thomas P. Fitch, BARRON'S

Exhibit C, pg 9 of 15

LII.08/12/18.10:16:57.01582

BUSINESS GUIDE DICTIONARY OF BANKING TERMS, "Credit banking," 3.
"Bookkeeping entry representing a deposit of funds into an account." But Plaintiff's
loan agreement apparently avoids claiming that the bank actually lent the Defendants
*money*.   They apparently state in the agreement that the Defendants are obligated to
repay Plaintiff principal and interest for the "Valuable consideration (money) the
bank gave the customer (borrower)." The loan agreement and Note apparently still
delete any reference to the bank's receipt of actual cash value from the Defendants
and exchange of that receipt for actual cash value that the Plaintiff banker returned.

12. **According to the Federal Reserve Bank of New York, money is anything that has
value that banks and people accept as money; money does not have to be issued
by the government.** For example, David H. Friedman, I BET YOU THOUGHT. . . .
9, Federal Reserve Bank of New York (4th ed. 1984)(apparently already introduced
into this case), explains that banks create new money by depositing IOUs, promissory
notes, offset by bank liabilities called  checking account balances.  Page 5 says,
"Money doesn't have to be intrinsically valuable, be issued by government, or be in
any special form. . . ."

13. The publication, Anne Marie L. Gonczy, MODERN MONEY MECHANICS 7-33,
Federal Reserve Bank of Chicago (rev. ed. June 1992)(apparently already introduced
into this case), contains standard bookkeeping entries demonstrating that *money*
ordinarily is recorded as a bank *asset*, while a bank *liability* is evidence of *money* that
a bank owes.  The bookkeeping entries tend to prove that banks accept cash, checks,
drafts, and promissory notes/credit agreements (assets) as *money* deposited to create
credit or checkbook money that are bank *liabilities*, which shows that, absent any
right of setoff, banks owe *money* to persons who deposit *money*.. **Cash (money of**

**exchange) is money, and credit or promissory notes (money of account) become money when banks deposit promissory notes with the intent of treating them like deposits of cash.** *See*, 12 U.S.C. Section 1813 (*l*)(1) (definition of "deposit" under Federal Deposit Insurance Act). The Plaintiff acts in the capacity of a lending or banking institution, and the newly issued credit or money is similar or equivalent to a promissory note, which may be treated as a deposit of money when received by the lending bank.. Federal Reserve Bank of Dallas publication MONEY AND BANKING, page 11, explains that when banks grant loans, they create new money. The new money is created because a new "loan becomes a deposit, just like a paycheck does." MODERN MONEY MECHANICS, page 6, says, "What they [banks] do when they make loans is to accept promissory notes in exchange for credits to the borrowers' transaction accounts." The next sentence on the same page explains that the banks' assets and liabilities increase by the amount of the loans.

## COMMENTARY AND SUMMARY OF ARGUMENT

14. Plaintiff apparently accepted the Defendants' Note and credit application (money of account) in exchange for its own credit (also money of account) and deposited that credit into an account with the Defendants' names on the account, as well as apparently issuing its own credit for $95,905.16 to Michigan National Bank for the account of the Defendants. One reasonably might argue that the Plaintiff recorded the Note or credit application as a loan (money of account) from the Defendants to the Plaintiff and that the Plaintiff then became the borrower of an equivalent amount of money of account from the Defendants.

**15. The Plaintiff in fact never lent any of its own pre-existing money, credit, or assets as consideration to purchase the Note or credit**

LII .88/12/18.18:16:57.81584

**agreement from the Defendants.** (Robertson Notes: I add that when the bank does the forgoing, then in that event, there is an utter **_failure of consideration_** for the "loan contract".) When the Plaintiff deposited the Defendants' $400,000 of newly issued credit into an account, the Plaintiff created from $360,000 to $400,000 of new money (the nominal principal amount less up to ten percent or $40,000 of reserves that the Federal Reserve would require against a demand deposit of this size). The Plaintiff received $400,000 of credit or money of account from the Defendants as an asset. GAAP ordinarily would require that the Plaintiff record a liability account, crediting the Defendants' deposit account, showing that the Plaintiff owes $400,000 of money to the Defendants, just as if the Defendants were to deposit cash or a payroll check into their account.

16. The following appears to be a disputed fact in this case about which I have insufficient information on which to form a conclusion: I infer that it is alleged that Plaintiff refused to lend the Defendants Plaintiff's own money or assets and recorded a $400,000 loan from the Defendants to the Plaintiff, which arguably was a $400,000 deposit of money of account by the Defendants, and then when the Plaintiff repaid the Defendants by paying its own credit (money of account) in the amount of $400,000 to third-party sellers of goods and services for the account of Defendants, the Defendants were repaid their loan to Plaintiff, and the transaction was complete.

17. I do not have sufficient knowledge of the facts in this case to form a conclusion on the following disputed points: None of the following material facts are disclosed in the credit application or Note or were advertised by Plaintiff to prove that the Defendants are the true lenders and the Plaintiff is the true borrower. **The Plaintiff is trying to use the credit application form or the Note to persuade**

Exhibit C; pg 12 of 15

LII.00/12/18.10:16:57.01585

**and deceive the Defendants into believing that the opposite occurred and that the Defendants were the borrower and not the lender.** The following point is undisputed: The Defendants' loan of their credit to Plaintiff, when issued and paid from their deposit or credit account at Plaintiff, became money in the Federal Reserve System (subject to a reduction of up to ten percent for reserve requirements) as the newly issued credit was paid pursuant to written orders, including checks and wire transfers, to sellers of goods and services for the account of *Defendants.*

## CONCLUSION

18. Based on the foregoing, Plaintiff is using the Defendant's Note for its own purposes, and it remains to be proven whether Plaintiff has incurred any financial loss or actual damages (I do not have sufficient information to form a conclusion on this point). In any case, the inclusion of the "lawful money" language in the repayment clause of the Note is confusing at best and in fact may be misleading in the context described above.

## AFFIRMATION

19. I hereby affirm that I prepared and have read this Affidavit and that I believe the foregoing statements in this Affidavit to be true. I hereby further affirm that the basis of these beliefs is either my own direct knowledge of the legal principles and historical facts involved and with respect to which I hold myself out as an expert or statements made or documents provided to me by third parties whose veracity I reasonably assumed.

Further the Affiant sayeth naught.

At Chagrin Falls, Ohio

Exhibit C, pg 13 of 15

LII .08/12/18.18:16:57.01586

December 5, 2003

WALKER F. TODD (Ohio bar no. 0064539)
Expert witness for the Defendants
Walker F. Todd, Attorney at Law
1164 Sheerbrook Drive
Chagrin Falls, Ohio 44022
(440) 338-1169, fax (440) 338-1537
e-mail:  westodd@adelphia.net

<mailto:westodd@adelphia.net>

### NOTARY'S VERIFICATION

At Chagrin Falls, Ohio
December 5, 2003

On this day personally came before me the above-named Affiant, who proved his identity to me to my satisfaction, and he acknowledged his signature on this Affidavit in my presence and stated that he did so with full understanding that he was subject to the penalties of perjury.

Notary Public of the State of Ohio

RECEIVED FOR FILING
52-3 DISTRICT COURT
2008 JUL 19  P 4: 27
DISTRICT COURT

Exhibit C, pg 14 of 15

L11 08/12/18 10:16:57 01587

Note is confusing at best and in fact may be misleading in the context described above.

**AFFIRMATION**

19. I hereby affirm that I prepared and have read this Affidavit and that I believe the foregoing statements in this Affidavit to be true. I hereby further affirm that the basis of these beliefs is either my own direct knowledge of the legal principles and historical facts involved and with respect to which I hold myself out as an expert or statements made or documents provided to me by third parties whose veracity I reasonably assumed.

Further the Affiant sayeth naught.

At Chagrin Falls, Ohio
December 5, 2003

*Walker F. Todd*

WALKER F. TODD (Ohio bar no. 0064539)
Expert witness for the Defendants
Walker F. Todd, Attorney at Law
1164 Sheerbrook Drive
Chagrin Falls, Ohio 44022
(440) 338-1169, fax (440) 338-1537
e-mail: wrstodd@adelphia.net

**NOTARY'S VERIFICATION**

At Chagrin Falls, Ohio
December 5, 2003

On this day personally came before me the above-named Affiant, who proved his identity to me to my satisfaction, and he acknowledged his signature on this Affidavit in my presence and stated that he did so with full understanding that he was subject to the penalties of perjury.

*L. G. Techman*

Notary Public of the State of Ohio

STATE OF MICHIGAN } SS.
COUNTY OF OAKLAND }

I BILL BULLARD JR., County Clerk for the County of Oakland, Clerk of the Circuit Court thereof, the same being a Court of Record and having a Seal, hereby certify that the attached is a true copy.

In Testimony whereof, I have hereunto set my hand and placed the Seal of said Court this 3/16/2011

BILL BULLARD JR. - Clerk / Register of Deeds

_M. Sprengell_                    Deputy Clerk

L. G. TECHMAN, Notary Public,
State of Ohio, Geauga County
My Commission Expires Sept. 5, 2005

Exhibit C, pg 15 of 15

ADDRESS: **934 S.W. 21ST WAY**
CITY / STATE / ZIP: **BOCA RATON, FL 33486**
PROPERTY: **934 SW 21ST WAY**
**BOCA RATON, FL 33486**

**INTEREST RATE: 6.875**
**INDEX USED**

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| **7.012** % | $ **899,605.67** | $ **637,605.95** | $ **1,537,211.62** |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | 4,270.04 | 12/01/2006 | | | |
| 1 | 4,267.26 | 11/01/2036 | | | |

**DEMAND FEATURE:** [X] This loan does not have a Demand Feature.     [ ] This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE**

[ ] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at: **934 SW 21ST WAY**
**BOCA RATON, FL 33486**

**ASSUMPTION:** Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms
[ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:** $

**PROPERTY INSURANCE:** Property hazard insurance is a required condition for this loan. You may purchase this insurance from any insurance company acceptable to the Lender.
[ ] Hazard insurance is available through the lender at an estimated cost of $     for     years.

**LATE CHARGES:** If your payment is more than **15** days late, a late charge of **5.00** % of the **overdue payment of principal and interest** will be assessed.

**PREPAYMENT:** If you pay off your loan early, you
[X] may [ ] will not have to pay a penalty.
[ ] may [X] will not be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.     e means estimate

I/We understand that this is neither a contract nor a commitment to lend. I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____    9/29/06 _____
**JOHN J KORMAN**       BORROWER / DATE                     BORROWER / DATE

_____    9/29/06



## FLORIDA DEPARTMENT *of* STATE

**RICK SCOTT**
Governor

DIVISION OF LIBRARY AND INFORMATION
SERVICES

**KURT S. BROWNING**
Secretary of State

I, Judith Ring, Division Director, Division of Library and Information Services, Florida Department of State, hereby certify the records of the Florida Supreme Court were transferred to the custody of the Florida State Archives pursuant to the provisions of Chapter 257, Florida Statutes, and that I am, by the terms of that transfer, the official custodian of the records.

I further certify that the attached is a true and correct copy of the record in the Florida State Archives, the original of which may be found in Series 49, carton 5140.

**WITNESS MY SIGNATURE**, this 22nd Day of March, 2011.

**JUDITH RING**, Director
Division of Library and Information Services

BY: _____

*Florida State Archives*

DIRECTOR'S OFFICE
R.A. Gray Building • 500 South Bronough Street • Tallahassee, Florida 32399-0250
850.245.6600 • FAX: 850.245.6282 • TDD: 850.922.4085 • **http://dlis.dos.state.fl.us**

COMMUNITY DEVELOPMENT
850.245.6600 • FAX: 850.245.6643

STATE LIBRARY OF FLORIDA
850.245.6600 • FAX: 850.245.6744

STATE ARCHIVES OF FLORIDA
850.245.6700 • FAX: 850.488.4894

CAPITOL BRANCH
850.488.2812 • FAX: 850.488.9871

RECORDS MANAGEMENT SERVICES
850.245.6750 • FAX: 850.245.6795

ADMINISTRATIVE CODE AND WEEKLY
850.245.6270 • FAX: 850.245.6282

Exhibit E, pg 1 of 12



IN THE SUPREME COURT OF FLORIDA

**FILED**
THOMAS D. HALL

CASE NO.: 09-1460

2009 SEP 30 A 11: 23

CLERK, SUPREME COURT

BY_____

**IN RE: AMENDMENTS TO RULES
OF CIVIL PROCEDURE AND FORMS FOR USE
WITH RULES OF CIVIL PROCEDURE**

---

## REQUEST FOR ORAL ARGUMENT ON BEHALF
## OF THE FLORIDA BANKERS ASSOCIATION

The Florida Bankers Association, by and through its undersigned counsel, respectfully requests to participate in oral argument if the Court deems such argument useful and appropriate on the Emergency Rule and Form Proposals of the Supreme Court Task Force on Residential Mortgage Foreclosure Cases.

Florida Bankers Association

Virginia Townes, Esquire
Florida Bar No. 361879
AKERMAN, SENTERFITT
420 South Orange Avenue
Suite 1200  (32801)
Post Office Box 231
Orlando, FL  32802
Tel.:  (407) 423-4000
Fax:  (407) 843-6610
virginia.townes@akerman.com

Counsel for Florida Bankers Association

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing comments have been served on The Honorable Jennifer D. Bailey, Task Force Chair, 73 W. Flagler Street, Suite 1307, Miami, Florida 33130-4764, this _28th_ day of September, 2009.

Virginia Townes, Esquire
Florida Bar No. 361879

{O1457250;1}

IN THE SUPREME COURT OF FLORIDA

CASE NO.: 09-1460

**IN RE: AMENDMENTS TO RULES
OF CIVIL PROCEDURE AND FORMS FOR USE
WITH RULES OF CIVIL PROCEDURE**

---

### <u>COMMENTS OF THE FLORIDA BANKERS ASSOCIATION</u>

The Florida Bankers Association thanks this Honorable Court for the opportunity to comment on the Emergency Rule and Form Proposals of the Supreme Court Task Force on Residential Mortgage Foreclosure Cases.

<u>Introduction</u>:

The Florida Bankers Association ("FBA") is one of Florida's oldest trade association. Its membership is composed of more than 300 banks and financial institutions ranging in size from small community banks and thrifts, to medium sized banks operating in several parts of the state, to large regional financial institutions headquartered in Florida or outside the state. The FBA serves its constituents and the citizens of the state of Florida by serving as an industry resource to all branches and levels of government in addressing those issues which affect the delivery of financial services within this state.

Exhibit E, 4 of 12

## SUMMARY OF THE COMMENTS

The Supreme Court Task Force on Residential Mortgage Foreclosure Cases ("Task Force") proposes an amendment to Florida Rule of Civil Procedure 1.110 to require verification of residential mortgage foreclosure complaints.  The proposed rule does not effectuate its stated goal of deterring plaintiffs that are not entitled to enforce the underlying obligation from bringing foreclosure actions.  Existing and effective law provides better substantive protection against unauthorized foreclosure suits.  Section 673.3091, Florida Statutes, establishes stringent proof standards when the original note is not available, and requires the court to protect the mortgagor against additional foreclosure actions.  In addition, the courts have ample authority to sanction lawyers and lenders asserting improper foreclosure claims.  This authority is explicit in Florida law and implicit in the courts' inherent power to sanction bad faith litigation.  Finally, the proposed amendment imposes a substantive condition precedent to foreclosing a residential mortgage foreclosures and thus appears to violate Florida's constitutional doctrine of separation of powers.

## COMMENTS

I.  THE PROPOSED AMENDMENT WILL NOT EFFECTUATE THE DESIRED GOAL.

The rationale for the proposed amendment is set forth in the proposal for promulgation:

This rule change is recommended because of the new economic reality dealing with mortgage foreclosure cases in an era of securitization. Frequently, the note has been transferred on multiple occasions prior to the default and filing of the foreclosure. Plaintiff's status as owner and holder of the note at the time of filing has become a significant issue in these case, particularly because many firms file lost note counts as a standard alternative pleading in the complaint. There have been situations where two different plaintiffs have filed suit on the same note at the same time. Requiring the plaintiff to verify its ownership of the note at the time of filing provides incentive to review and ensures that the filing is accurate, ensures that investigation has been made and that the plaintiff is the owner and holder of the note. This requirement will reduce confusion and give the trial judges the authority to sanction those who file without assuring themselves of their authority to do so.

With respect and appreciation for the efforts of the Task Force and its laudable goals, the proposed amendment will not effectuate the reduction of confusion or give trial judges any authority they currently lack.

A.      Plaintiff's Status as Owner and Holder of the Note.

In actual practice, confusion over who owns and holds the note stems less from the fact that the note may have been transferred multiple times than it does from the **form** in which the note is transferred. It is a reality of commerce that virtually all paper documents related to a note and mortgage are converted to electronic files almost immediately after the loan is closed. Individual loans, as electronic data, are compiled into portfolios which are transferred to the secondary market, frequently as mortgage-backed securities. The records of ownership and payment are maintained by a servicing agent in an electronic database.

The reason "many firms file lost note counts as a standard alternative pleading in the complaint" is because the physical document was deliberately eliminated to avoid confusion immediately upon its conversion to an electronic file. *See State Street Bank and Trust Company v. Lord*, 851 So. 2d 790 (Fla. 4th DCA 2003). Electronic storage is almost universally acknowledged as safer, more efficient and less expensive than maintaining the originals in hard copy, which bears the concomitant costs of physical indexing, archiving and maintaining security. It is a standard in the industry and becoming the benchmark of modern efficiency across the spectrum of commerce—including the court system.

The information reviewed to verify the plaintiff's authority to commence the mortgage foreclosure action will be drawn from the same database that includes the electronic document and the record of the event of default. The verification, made "to the best of [the signing record custodian's] knowledge and belief" will not resolve the need to establish the lost document.

B.    The Process for Re-Establishing the Note Provides Significant Substantive Protection to the Mortgagor.

The process for re-establishment of a lost or destroyed instrument by law imposes a strict burden of proof and instructs the court to protect the obligor from multiple suits on the same instrument. Section 673.3091, Florida Statutes, sets forth the elements a plaintiff must prove in order to enforce an obligation for which it does not have the original instrument:

A person not in possession of an instrument is entitled to enforce the instrument if:

a) person seeking to enforce the instrument was entitled to enforce the instrument when loss of possession occurred, or has directly or indirectly acquired ownership of the instrument from a person who was entitled to enforce the instrument when loss of possession occurred.

b) The loss of possession was not the result of a transfer by the person or a lawful seizure; and

c) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

Once the plaintiff has plead **and proved** the foregoing, there is an additional

judicial requirement:

**The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means.**

§ 673.3091(2), Fla. Stat. (emphasis added).[1]  This protection may be effectuated by

any means satisfactory to the court.  It commonly takes the form of a provision in

the final judgment stating that to the extent any obligation of the note is later

deemed not to have been extinguished by merger into the final judgment, the

plaintiff has by law accepted assignment of those obligations.  In other words, the

---

[1]The legislature amended Section 673.3091, Florida Statutes, in 2004 to address the issues raised by the *State Street* court in recognition of the commercial reality that almost all purchase money notes are electronically stored and assigned in electronic form.

plaintiff who enforces a lost or destroyed instrument assumes the risk that a third party in lawful possession of the original note or with a superior interest therein will assert that claim.  The original obligor has no liability.

    C.    **Courts Have Statutory and Inherent Authority to Sanction Plaintiffs Asserting Claims Not Supported by Law or Evidence.**

Any party seeking to foreclose a mortgage without a good faith belief—based on investigation reasonable under the circumstances--in the facts giving rise to the asserted claim may be sanctioned "upon the court's initiative." § 57.105(1), Fla. Stat.  This statute, though somewhat underused by our courts, affords judges the authority to immediately impose significant penalties for bringing unfounded litigation.  Perhaps more significant is this Court's recent (and appropriate) reaffirmation of a trial court's inherent authority to sanction litigants—specifically attorneys—who engage in bad faith and abusive practice.  *See Moakely v. Smallwood*, 826 So. 2d 221, 223 (Fla. 2002), citing *United States Savings Bank v. Pittman*, 80 Fla. 423, 86 So. 567, 572 (1920) (sanctioning attorney for acting in bad faith in a mortgage foreclosure sale).[2]

---

[2] The potential for sanctions is **in addition** to the significant economic deterrence to bringing unauthorized foreclosure actions.  Presuit costs such as title searches and identification of tenants and/or subordinate lienors, the escalating filing fees and costs of service (particularly publication service and the concomitant cost of diligent search if the mortgagor no longer resides in the collateral) significantly raise the cost of filing a suit in error.

II.   REQUIRING   VERIFICATION   OF   RESIDENTIAL   MORTGAGE
FORECLOSURE   COMPLAINTS   IMPLEMENTS   PUBLIC   POLICY
WITHIN THE LEGISLATURE'S CONSTITUTIONAL AUTHORITY.

The Task Force Report giving rise to the proposed amendment clearly speaks to a public policy concern unrelated to the procedural concerns of the courts.   The stated purpose—to prevent the filing of multiple suits on the same note—is clearly a matter of public policy rather than one of court procedure. Requiring verification of a residential mortgage foreclosure complaint imposes a condition precedent to access to courts that exceeds the procedural scope of the Florida Rule of Civil Procedure 1.110.   In situations in which verification of complaints or petitions is established as a threshold requirement for pursuing an action, that requirement is imposed by the legislature. *See, e.g.*, § 702.10, Fla. Stat. (requiring verification of mortgage foreclosure complaint where plaintiff elects Order to Show Cause procedure.)   If public policy favors setting an evidentiary threshold for access to courts, the legislature must exercise its policy-making authority.

The only other rule of civil procedure which imposes the duty to verify a petition is a petition for temporary injunction. Fla. R. Civ. P. 1.610.  The rationale for requiring verification there is clear:  The petition itself and any supporting affidavits constitute the evidence supporting the requested temporary injunction. The court's decision is made solely on the evidentiary quality of the documents

before it.  That is not the case here.  Verification of the foreclosure complaint will not relieve the plaintiff seeking to foreclose a residential mortgage of the burden of proving by competent and substantial evidence that it is the holder of the note secured by the mortgage and entitled to enforce the mortgagor's obligation.

Verification adds little protection for the mortgagor and, realistically, will not significantly diminish the burden on the courts.  The amendment is not needed or helpful.

## CONCLUSION

The Florida Bankers Association recognized the hard work and the laudable goals of the Supreme Court Task Force on Residential Mortgage Foreclosure Cases.  However, it appears that in the urge to find new ways to address the crisis facing mortgagors **and mortgagees** as well as the court system, the Task Force fashioned a new and ineffectual rule while ignoring the panoply of significant and substantive weapons already provided by Florida law.   The Florida Bankers Association respectfully requests that this Honorable Court decline to adopt the proposed amendment to Florida Rule of Civil Procedure 1.110.