Respectfully submitted,

Florida Bankers Association

_Virginia Townes_

Alejandro M. Sanchez
President and CEO
Florida Bankers Association
1001 Thomasville Road, Suite 201
Suite 201
Tallahassee, FL 32303
Phone: (850) 224-2265
Fax: (850) 224-2423
asanchez@floridabankers.com

Virginia B. Townes, Esquire
Florida Bar No.: 361879
AKERMAN, SENTERFITT
420 South Orange Avenue
Suite 1200    (32801)
Post Office Box 231
Orlando, FL 32802
Phone: (407) 423-4000
Fax: (407) 843-6610

virginia.townes@akerman.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing comments have been served on The Honorable Jennifer D. Bailey, Task Force Chair, 73 W. Flagler Street, Suite 1307, Miami, Florida 33130-4764, this 28th day of September, 2009.

_Virginia B. Townes_

Virginia Townes, Esquire
Florida Bar No. 361879

{O1456895;1}

9

Exhibit E, 12 of 12

NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS

Borrower Name & Address:    JOHN J KORMAN                                Loan Number:    0039153879

934 S.W. 21ST WAY
BOCA RATON, FLORIDA 33486

You are hereby notified* that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from
LEHMAN BROTHERS BANK, FSB

to
AURORA LOAN SERVICES                                        , effective      11/15/06

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing. [In this case, all necessary information is combined in this one notice.]
Your present servicer is   LEHMAN BROTHERS BANK, FSB

If you have any questions relating to the transfer of servicing from your present servicer call
Customer Service at 877-266-7208                                                                        between
8       a.m. and  5 MST  p.m. on the following days  Monday – Friday   . This is a toll-free or collect call number.

Your new servicer will be   AURORA LOAN SERVICES

The business address for your new servicer is: P.O. BOX 1706
SCOTTSBLUFF, NE 69363-1706
The toll-free or collect call telephone number of your new servicer is  800-550-0508
If you have any questions relating to the transfer of servicing to your new servicer call
Customer Service                                            at           800-550-0508
between    8       a.m. and  5 MST  p.m. on the following days   Monday – Friday
The date that your present servicer will stop accepting payments from you is   11/15/06
The date that your new servicer will start accepting payments from you is     11/15/06
Send all payments due on or after that date to your new servicer.
The transfer of servicing rights may affect the terms of or the continued availability of mortgage life or disability insurance or any other type of optional insurance in the following manner: _____

_____
_____
_____
and you should take the following action to maintain coverage: _____

_____
_____
_____
_____

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2605):
During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.
Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to this address:

P.O. BOX 1706
SCOTTSBLUFF, NE 69363-1706

Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.
A Business Day is any day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.
Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

*This notification is a requirement of Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605).

LEHMAN BROTHERS BANK, FSB          9/29/2006     AURORA LOAN SERVICES                9/29/2006
PRESENT SERVICER                           Date          FUTURE SERVICER                     Date

⌒~-553R  (9901)                            12/94
VMP MORTGAGE FORMS - (800)521-7291         Exhibit F, pg 1 of 1



 **Aurora • Loan Services**

November 16, 2010

2617 COLLEGE PARK • P.O. BOX 1706 • SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 • FAX: 303-728-7648

John J. Korman
934 SW 21ˢᵗ Way
Boca Raton, FL 33486

RE:    Loan Number:  0039153879
       Property address:  934 SW 21ˢᵗ Way, Boca Raton, FL 33486

Dear Mr. Korman:

This letter responds to multiple correspondence items received from you in November 2010.

Kahrl Wutscher LLP (KW-LLP) previously provided you with various documents, information and disclosures in writing on March 24, 2010, April 23, 2010, May 18, 2010, June 9, 2010 and September 1, 2010.

Aurora Loan Services LLC (Aurora Loan Services) asks that you please review those items carefully.  We believe your concerns were addressed by KW-LLP's, and Aurora Loan Services' prior correspondence, and the documents and information they provided.  Please review the extensive documentation and information previously provided to you.

If you have new concerns relating to the servicing of the above-referenced loan account, please describe your concerns in writing to us indicating the reasons you believe the account is in error. Correspondence should be sent to the address in the letterhead above.

For simple factual inquires regarding the servicing of the loan(s) at issue, please contact our Customer Service Representatives at the address in the letterhead above, or by calling 800-550-0508.

Sincerely,

Loan Research Department
Aurora Loan Services

Aurora Loan Services is a debt collector. Aurora Loan Services is attempting to collect a debt and any information obtained will be used for that purpose. However, if you are in bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally, but is notice of a possible enforcement of the lien against the collateral property.


EQUAL HOUSING
LENDER    AURORA LOAN SERVICES LLC

Exhibit G, pg 1 of 1

Recording Requested By:
AURORA LOAN SERVICES

When Recorded Return To:

ASSIGNMENT PREP
AURORA LOAN SERVICES
P.O. Box 1706
Scottsbluff, NE 69363-1706

CFN 20090332756
OR BK 23452 PG 0273
RECORDED 09/24/2009 16:11:08
Palm Beach County, Florida
Sharon R. Bock, CLERK & COMPTROLLER
Pgs 0273 - 274; (2pgs)

---

Palm Beach, Florida
SELLER'S SERVICING #:5039163879 "KORMAN"

## CORPORATE ASSIGNMENT OF MORTGAGE

MERS #: 100025440903385393  VRU #: 1-888-679-6377

Date of Assignment: June 8th, 2009
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR LEHMAN BROTHERS BANK, FSB, A FEDERAL SAVINGS BANK IT'S SUCCESSORS AND ASSIGNS at 3300 S.W. 34TH AVENUE, SUITE 101, OCALA, FL 34474
Assignee: AURORA LOAN SERVICES LLC at 2617 COLLEGE PARK, SCOTTSBLUFF, NE 69361
Executed By: JOHN J KORMAN, A MARRIED MAN, JOINED BY HIS SPOUSE, PAMELA KORMAN To:
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR LEHMAN BROTHERS BANK, FSB, A FEDERAL SAVINGS BANK
Date of Mortgage: 09/29/2006 Recorded: 10/11/2006 in Book/Reel/Liber: 20949 Page/Folio: 0270 as Instrument No.: 20060578615 In Palm Beach, Florida

Property Address: 934 SW 21ST WAY, BOCA RATON, FL 33486

Legal: LOT 8, BLOCK 7, BRAMALEA UNICORP, BOCA RATON - SECOND ADDITION P.U.D., ACCORDING TO MAP OR PLAT THEREOF AS RECORDED IN PLAT BOOK 47, PAGE 139 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN and NO/100ths DOLLARS and other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage together with the Note or other evidence of indebtedness (the "Note"), said Note having an original principal sum of $650,000.00 with interest, secured thereby, together with all moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage and Note, and also the said property unto the said Assignee forever, subject to the terms contained in said Mortgage and Note.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR LEHMAN BROTHERS BANK, FSB, A FEDERAL SAVINGS BANK IT'S SUCCESSORS AND ASSIGNS
On June 8th, 2009

By: _____
THEODORE SCHULTZ, Vice-President

WITNESS
_____
JANIE FLORES

WITNESS
_____
SUSAN LINDHORST

*ALS*2LMS1*20090824-004713B AM* ALSP*ALSIH*00000000000COMBINED* FLP*LNP 5039163879 FLSTATE_MORT_ASSIGN_ASSN "KORMAN"

*Exhibit "B"*

Exhibit H, pg 1 of 2

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

STATE OF Nebraska
COUNTY OF Scotts Bluff

ON June 8th, 2009, before me, DARLINE DIETZ, a Notary Public in and for the County of Scotts Bluff County, State of Nebraska, personally appeared THEODORE SCHULTZ, Vice-President, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

*Darline Dietz*
DARLINE DIETZ
Notary Expires: 03/22/2010

GENERAL NOTARY-State of Nebraska
DARLINE DIETZ
My Comm. Exp. March 22, 2010

(This area for notarial seal)

Prepared By:   Rhonda Dall, AURORA LOAN SERVICES 2917 COLLEGE PARK, PO BOX 1706, SCOTTSBLUFF, NE
69363-1706 388-535-3000

**Exhibit H, pg 2 of 2**

# Kahrl Wutscher LLP

The Loop Center Building
105 W. Madison Street
Suite 2100
Chicago, Illinois 60602
Tel. (888) 339-5282
Fax . (866) 581-9302
www.kw-llp.com

**A. John Shutt**
*Compliance Analyst*
Direct: (702) 335-3940
ashutt@kw-llp.com

March 24, 2010

**Via Regular Mail**

John J. Korman
934 SW 21st Way
Boca Raton, FL 33486

**RE:**     **Various Communications**
        **Borrowers: John J. Korman**
        **Property Address: 934 SW 21st Way, Boca Raton, FL 33486**
        **Loan No. 0039153879**

Dear John J. Korman:

We represent Aurora Loan Services LLC ("Aurora") in connection with the above-referenced matter. This is not an attempt to collect a debt. This letter responds to your *Affidavit, Rescission of Signature and Plain Statement of Facts* dated February 1, 2010, *Aurora's Answer To Korman's First Set of Interrogatories* dated December 12, 2008, *Corporate Assignment of Mortgage* dated July 9, 2008, *Affidavit Of Walker F. Todd Expert Witness For Defendants* dated December 5, 2003 and the *Notice to Cease and Desist* dated February 1, 2010, copies of which are included here for your ease of reference.

As you know, Aurora has previously provided you with extensive information and disclosures regarding the loan or debt referenced above. Nevertheless, **please read the following disclosures carefully:**

This law firm and its lawyers are not debt collectors, and this is not an attempt to collect any debt. However, any information obtained may be used for the purposes of debt collection.

A payoff statement for this debt, which will indicate the amount of the debt and related information, is being generated and will be provided to you under separate cover. The payoff statement includes important additional information.

CALIFORNIA - ILLINOIS - WASHINGTON, D. C.

Exhibit I, pg 1 of 5

# Kahrl Wutscher LLP

A. John Shutt
*Compliance Analyst*
Page 2 of 5

Please send any payment to Aurora, at the address indicated on the payoff statement.

Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day that you pay may be greater than the amount shown on the payoff statement. Hence, if you pay the amount indicated on the payoff statement, an adjustment may be necessary after Aurora receives your payment, in which event Aurora will inform you before depositing any check for collection.

For further information, please contact:

> Aurora Customer Service
> 2617 College Park
> Post Office Box 1706
> Scottsbluff, Nebraska 69363-1706
> Telephone: (800) 550-0508

Unless you dispute the validity of the debt, or any portion thereof, within 30 days after receipt of this notice, the debt will be assumed to be valid.

Aurora has the right to enforce the Note evidencing the debt, and has the right to receive payment of the debt for and on behalf of the owner of the debt.

The name of the current owner of the debt is: Lehman Brothers Holdings Inc. 745 Seventh Ave., 7th Floor, New York, NY 10019.

We include with this letter various documents verifying and evidencing the debt, including but not limited to copies of the note, security instrument, and payment history.

The name and address of the original creditor is: Lehman Brothers Bank, FSB. 400 Professional Drive, Suite 500, Gaithersburg, MD 20879.

Please note that this letter and the related documents are provided for informational purposes only, and in response to your inquiry. If you are making payments on the debt pursuant to a Chapter 13 bankruptcy plan, please also note that the documents may not reflect developments that may recently have occurred in connection with your Chapter 13 bankruptcy. In such a case, please contact us for the most up to date information.

Section 6 of RESPA (12 U.S.C. § 2605) requires that a "qualified written request" must relate to the servicing of the subject loan, and should include a statement of the reasons the borrower believes the account is in error. Many of your questions do not relate to the servicing

# Kahrl Wutscher LLP

A. John Shutt
*Compliance Analyst*
Page 3 of 5

of this particular loan, and request documents rather than information as allowed by the statute. Similarly, please note that Aurora is only the servicer of the subject loan and that the questions and allegations relating to the origination of the loan are not within its purview, and that in any event you should submit a loan modification application in accordance with the instructions provided.

Nevertheless, subject to and without waiving any objections, Aurora responds to your various communications as follows:

**Communication Dated February 1, 2010:** *"Affidavit, Rescission of Signature and Plain Statement of Facts."*

Your communication titled *Affidavit, Rescission of Signature and Plain Statement of Facts* is vague, ambiguous and consequently Aurora is not able to discern what is intended without additional clarification from you. Nevertheless, Aurora does not authorize the removal of the original signature(s) on the note, mortgage/deed of trust, or any other loan documents. Accordingly, Aurora rejects any such attempt to remove said signatures.

Further, your "Official Notice of Fraud" is vague, ambiguous and unsupported by any facts or evidence from you. Accordingly, such unsupported allegations are denied and we hereby demand that you specifically enumerate what you believe to be fraudulent on this loan, and provide such information to this office. Furthermore, we hereby demand that within ten (10) days after you receive this letter you remove the fraudulent filing/recording, if any, and send proof of removal to this office.

Your request to "Cancel/Postpone Foreclosure" is vague, ambiguous and unsupported by any facts or evidence from you. Accordingly, such unsupported allegations are denied and we hereby demand that you specifically enumerate what you believe to be fraudulent on this loan, and provide such information to this office. In response to this request, Aurora states that a copy of the note and Security Instrument, including all addenda and/or riders, which you executed to receive the loan, are enclosed with this letter. Aurora states that it is the current servicer, master servicer and/or sub-servicer of this loan and that the current owner of the loan is identified in the text box disclosures above. As the servicer, Aurora has the right to enforce the note evidencing the debt, and has the right to receive payment of the debt for and on behalf of the owner of the debt. Aurora further states that a copy of the loan history is enclosed with this letter for your review.

In no way does Aurora tacitly agree that failure to respond to you within twenty-one days of receipt, allows you to presume that Aurora' accepts "personal liability jointly or severally external to qualified immunity and waiver of any decision rights of remedy." Nor does Aurora agree to be bound by any of your fictitious remedies and/or damages. Simply, your unilateral creation of this document is not binding and is without legal consequence.

Exhibit I, pg 3 of 5

# Kahrl Wutscher LLP

A. John Shutt
*Compliance Analyst*
Page 4 of 5

***Communications Dated December 12, 2008:*** *"Aurora's Answer To Korman's First Set of Interrogatories."*

Your communications titled *Aurora's Answer To Korman's First Set of Interrogatories* appears to be for informational purposes and therefore no response is required.

***Communications Dated July 9, 2008:*** *"Corporate Assignment of Mortgage."*

Your communications titled *Corporate Assignment of Mortgage* appears to be for informational purposes and therefore no response is required.

***Communications Dated December 5, 2003:*** *"Affidavit Of Walker F. Todd Expert Witness For Defendants."*

Your communications titled *Affidavit Of Walker F. Todd Expert Witness For Defendants* appears to be for informational purposes and therefore no response is required.

***Communication Dated February 1, 2010:*** *"Notice to Cease and Desist."*

Your communication titled *Notice to Cease and Desist* regarding validation of the debt is vague, ambiguous and consequently Aurora is not able to discern what is intended without additional clarification from you. Nevertheless, Aurora again states that a copy of the note and Security Instrument, including all addenda and/or riders, which you executed to receive the loan, are enclosed with this letter. Aurora states that it is the current servicer, master servicer and/or sub-servicer of this loan and that the current owner of the loan is identified in the text box disclosures above. As the servicer, Aurora has the right to enforce the note evidencing the debt, and has the right to receive payment of the debt for and on behalf of the owner of the debt. Aurora further states that a copy of the loan history is enclosed with this letter for your review.

If you are seeking to effectuate the release of the mortgage/deed of trust ("security instrument") and cancellation of the note that secures the above-caption home loan now being serviced by Aurora, your request is hereby rejected for the reason that you have not made payment according to the contractual terms of your home loan. Therefore, you are expected to comply with the contractual terms and provisions of your home loan.

Due to the nature of your communications, we strongly recommend that you consult with a local attorney about your home loan rights, obligations and liabilities. If you already have legal counsel representing you, please provide their contact information so that further communications can be sent directly to that individual.

For simple factual inquiries regarding the servicing of the loan(s) at issue, please contact Aurora's Customer Service Help Desk at:

Exhbit I, pg 4 of

**Kahrl Wutscher LLP**

A. John Shutt
*Compliance Analyst*
Page 5 of 5

Aurora Customer Service
2617 College Park
Post Office Box 1706
Scottsbluff, Nebraska 69363-1706
Telephone: (800) 550-0508

Origination and the underwriting and closing of the loan transaction questions should be directed to:

Executive Communications
10350 Park Meadows Drive
Littleton, Colorado 80124
Telephone: (866) 420-3167

Otherwise, please contact the undersigned at the address and/or telephone number given above.

If you are interested in requesting a loan modification, please fill out the enclosed Borrower's Financial Statement, and return it to the undersigned. Also, please provide: (1) copies of the borrower's paystubs for the last two months; (2) if the borrower is self-employed, complete copies of the borrower's tax returns for the last two years; (3) copies of the borrower's complete bank statements for the last two months; and (4) a hardship letter, explaining why the borrower fell behind on the borrower's mortgage payments and how the borrower believes s/he will now be able to make those payments.

Thank you for your anticipated cooperation.

Sincerely,

A. John Shutt
*Compliance Analyst*

Enc.

Exhibit I, pg 5 of 5

# Kahrl Wutscher LLP

The Loop Center Building
105 W. Madison Street
Suite 2100
Chicago, Illinois 60602
Tel. (888) 339-5282
Fax (866) 581-9302
www.kw-llp.com

**Emily Garrison**
EGarrison@kw-llp.com

September 1, 2010

**Via Regular Mail**

John J. Korman
934 SW 21st Way
Boca Raton, FL 33486

RE:   **Various Communications**
**Borrowers: John J. Korman and Pamela Korman**
**Property Location: 934 SW 21st Way, Boca Raton, FL 33486**
**Loan No. 0039153879**

Dear John J. Korman:

As you recall, we represent Aurora Loan Services LLC ("Aurora") in connection with the above-named matter. This law firm and its lawyers are not debt collectors, and this is not an attempt to collect any debt. However, any information obtained may be used for the purpose of debt collection. This letter responds to your untitled communications purportedly dated July 12, 2010 and July 19, 2010, copies of which are included here for your convenience.

We previously provided you with various documents, information and disclosures in writing on March 24, 2010, April 23, 2010, May 18, 2010, June 9, 2010 and July 12, 2010, and ask again that you please review those items carefully. We believe your concerns were addressed in our prior correspondence, and the documents and information we provided with it. A copy of our prior correspondence is included again here for your ease of reference.

In addition, we included with our prior correspondence a complete copy of the loan origination file for the loan referenced above, including without limitation copies of the note, security instrument, disclosures, application materials, credit reports, underwriting documents, appraisals, and closing documents. We also included with our prior correspondence a detailed payment history for that loan. We also described the current holder and servicer of the debt, the name of the current owner of the debt, the name and address of the original creditor, and provided additional information and documentation evidencing or otherwise verifying the debt. In short, we provided you with extensive information and documentation regarding the ownership, origination, and servicing of the loan, in clear and concise language.

Please note that requests to Aurora must relate to the servicing of the subject home loan and should include a statement of the reasons you believe the account is in error. In reviewing your communication(s), you do not appear to make any requests or raise any issues related to the

CALIFORNIA - ILLINOIS - WASHINGTON, D.C.

Exhibit J, pg 1 of 2

# Kahrl Wutscher LLP

**Emily Garrison**
Page 2 of 2

servicing of the subject loan and instead assert incorrect and unsupportable allegations relating solely to supposed acts and omissions of persons or entities other than Aurora. We further note that your communication(s) and related allegations again fail to mention any issue or purported error relating to the servicing of the mortgage loan referenced above. To the extent that statements in your letter consist of allegations of wrongdoing of any nature by Aurora or otherwise, Aurora denies your allegations, and respectfully requests that you review the documents and information provided with this and/or any previous correspondence for further explanation and clarification.

Nevertheless, subject to and without waiving any objections, Aurora responds to your alleged additional requests as follows:

*Request: "Who is Aurora Loan Services LLC servicing the above-referenced account for?"*

**Response:** Subject to and without waiving any objections, Aurora states that it previously provided to you the name of the current owner of the subject loan and states again here that the name of the current owner of the debt is: Lehman Brothers Holdings Inc. 745 Seventh Ave., 7th Floor, New York, NY 10019.

It is Aurora's position that its previous responses, as well as the documentation, information, and disclosures provided therewith, have been responsive to all of your inquiries. Therefore, Aurora will not respond to any further communications from you that merely repeat your prior requests, demands or allegations or which are vague and ambiguous. However, if you have new concerns relating to the servicing of the above-referenced loan account, please describe your concerns in writing to us at the address and/or fax number above by specifically indicating the reasons you believe the account is in error.

Aurora states that, subject to and without waiving any objections, it reserves any and all rights and powers of sale afforded to it by the note and security instrument related to the above referenced loan account and property, subject to applicable state and federal law.

Due to the nature of your communications, we strongly recommend that you consult with a local attorney about your home loan rights, obligations and liabilities. If you already have legal counsel representing you, please provide their contact information so that further communications can be sent directly to that individual.

Sincerely,

Emily Garrison

Enc.



MERS
ServicerID
www.mers-servicerid.org

# Process Loans, Not Paperwork.™

## 1 record matched your search:

Need help? 

MIN: 1000254-4000039538-8        Note Date: 09/29/2006        MIN Status: **Active**

Servicer: Aurora Loan Services LLC        Phone: **(308) 220-2123**
Scottsbluff, NE

Investor: **Aurora Bank FSB**        Phone: (308) 220-2123
Scottsbluff, NE

Return to Search

For more information about MERS please go to www.mersinc.org

Exhibit K, pg 1 of 1

# MODERN MONEY MECHANICS

## A Workbook on Bank Reserves and Deposit Expansion

### Federal Reserve Bank of Chicago

This complete booklet is was originally produced and distributed free by:
Public Information Center
Federal Reserve Bank of Chicago
P. O. Box 834
Chicago, IL 60690-0834
telephone: 312 322 5111
But it is now out of print. Photo copies can be made available by monques@myhome.net.

## Introduction

*The purpose of this booklet is to describe the basic process of money creation in a "fractional reserve" banking system. The approach taken illustrates the changes in bank balance sheets that occur when deposits in banks change as a result of monetary action by the Federal Reserve System - the central bank of the United States. The relationships shown are based on simplifying assumptions. For the sake of simplicity, the relationships are shown as if they were mechanical, but they are not, as is described later in the booklet. Thus, they should not be interpreted to imply a close and predictable relationship between a specific central bank transaction and the quantity of money.*

*The introductory pages contain a brief general description of the characteristics of money and how the U.S. money system works. The illustrations in the following two sections describe two processes: first, how bank deposits expand or contract in response to changes in the amount of reserves supplied by the central bank; and second, how those reserves are affected by both Federal Reserve actions and other factors. A final section deals with some of the elements that modify, at least in the short run, the simple mechanical relationship between bank reserves and deposit money.* Money is such a routine part of everyday living that its existence and acceptance ordinarily are taken for granted. A user may sense that money must come into being either automatically as a result of economic activity or as an outgrowth of some government operation. But just how this happens all too often remains a mystery.

## What is Money?

If money is viewed simply as a tool used to facilitate transactions, only those media that are readily accepted in exchange for goods, services, and other assets need to be considered. Many things - from stones to baseball cards - have served this monetary function through the ages. Today, in the United States, money used in transactions is mainly of three kinds - currency (paper money and coins in the pockets and purses of the public); demand deposits (non-interest bearing checking accounts in banks); and other checkable deposits, such as negotiable order of withdrawal (NOW) accounts, at all depository institutions, including commercial and savings banks, savings and loan associations, and credit unions. Travelers checks also are included in the definition of transactions money. Since $1 in currency and $1 in checkable deposits are freely

convertible into each other and both can be used directly for expenditures, they are money in equal degree. However, only the cash and balances held by the nonbank public are counted in the money supply. Deposits of the U.S. Treasury, depository institutions, foreign banks and official institutions, as well as vault cash in depository institutions are excluded.

This transactions concept of money is the one designated as M1 in the Federal Reserve's money stock statistics. Broader concepts of money (M2 and M3) include M1 as well as certain other financial assets (such as savings and time deposits at depository institutions and shares in money market mutual funds) which are relatively liquid but believed to represent principally investments to their holders rather than media of exchange. While funds can be shifted fairly easily between transaction balances and these other liquid assets, the money-creation process takes place principally through transaction accounts. In the remainder of this booklet, "money" means M1.

The distribution between the currency and deposit components of money depends largely on the preferences of the public. When a depositor cashes a check or makes a cash withdrawal through an automatic teller machine, he or she reduces the amount of deposits and increases the amount of currency held by the public. Conversely, when people have more currency than is needed, some is returned to banks in exchange for deposits.

While currency is used for a great variety of small transactions, most of the dollar amount of money payments in our economy are made by check or by electronic transfer between deposit accounts. Moreover, currency is a relatively small part of the money stock. About 69 percent, or $623 billion, of the $898 billion total stock in December 1991, was in the form of transaction deposits, of which $290 billion were demand and $333 billion were other checkable deposits.

## What Makes Money Valuable?

In the United States, neither paper currency nor deposits have value as commodities. Intrinsically, a dollar bill is just a piece of paper, deposits merely book entries. Coins do have some intrinsic value as metal, but generally far less than their face value.

What, then, makes these instruments - checks, paper money, and coins - acceptable at face value in payment of all debts and for other monetary uses? Mainly, it is the confidence people have that they will be able to exchange such money for other financial assets and for real goods and services whenever they choose to do so. Money, like anything else, derives its value from its *scarcity* in relation to its usefulness. Commodities or services are more or less valuable because there are more or less of them relative to the amounts people want. Money's usefulness is its unique ability to command other goods and services and to permit a holder to be constantly ready to do so. How much money is demanded depends on several factors, such as the total volume of transactions in the economy at any given time, the payments habits of the society, the amount of money that individuals and businesses want to keep on hand to take care of unexpected transactions, and the forgone earnings of holding financial assets in the form of money rather than some other asset.

Control of the *quantity* of money is essential if its value is to be kept stable. Money's real value can be measured only in terms of what it will buy. Therefore, its value varies inversely with the general level of prices. Assuming a constant rate of use, if the volume of money grows more rapidly than the rate at which the output of real goods and

# Bank Deposits - How They Expand or Contract

Let us assume that expansion in the money stock is desired by the Federal Reserve to achieve its policy objectives. One way the central bank can initiate such an expansion is through purchases of securities in the open market. Payment for the securities adds to bank reserves. Such purchases (and sales) are called "open market operations."
How do open market purchases add to bank reserves and deposits? Suppose the Federal Reserve System, through its trading desk at the Federal Reserve Bank of New York, buys $10,000 of Treasury bills from a dealer in U. S. government securities.(3) In today's world of computerized financial transactions, the Federal Reserve Bank pays for the securities with an "telectronic" check drawn on itself.(4) Via its "Fedwire" transfer network, the Federal Reserve notifies the dealer's designated bank (Bank A) that payment for the securities should be credited to (deposited in) the dealer's account at Bank A. At the same time, Bank A's reserve account at the Federal Reserve is credited for the amount of the securities purchase. The Federal Reserve System has added $10,000 of securities to its assets, which it has paid for, in effect, by *creating* a liability on itself in the form of bank reserve balances. These reserves on Bank A's books are matched by $10,000 of the dealer's deposits that did not exist before. *See* *illustration 1*

## How the Multiple Expansion Process Works

If the process ended here, there would be no "multiple" expansion, i.e., deposits and bank reserves would have changed by the same amount. However, banks are required to maintain reserves equal to only a fraction of their deposits. Reserves in excess of this amount may be used to increase earning assets - loans and investments. Unused or excess reserves earn no interest. Under current regulations, the reserve requirement against most transaction accounts is 10 percent.(5) Assuming, for simplicity, a uniform 10 percent reserve requirement against all transaction deposits, and further assuming that all banks attempt to remain fully invested, we can now trace the process of expansion in deposits which can take place on the basis of the additional reserves provided by the Federal Reserve System's purchase of U. S. government securities.
The expansion process may or may not begin with Bank A, depending on what the dealer does with the money received from the sale of securities. If the dealer immediately writes checks for $10,000 and all of them are deposited in other banks, Bank A loses both deposits and reserves and shows no net change as a result of the System's open market purchase. However, other banks have received them. Most likely, a part of the initial deposit will remain with Bank A, and a part will be shifted to other banks as the dealer's checks clear.
It does not really matter where this money is at any given time. The important fact is that *these deposits do not disappear*. They are in some deposit accounts at all times. All banks together have $10,000 of deposits and reserves that they did not have before. However, they are not required to keep $10,000 of reserves against the $10,000 of deposits. All they need to retain, under a 10 percent reserve requirement, is $1000. The remaining $9,000 is "excess reserves." This amount can be loaned or invested. *See illustration 2.*
If business is active, the banks with excess reserves probably will have opportunities to loan the $9,000. Of course, they do not really pay out loans from the money they receive as deposits. If they did this, no additional money would be created  What they

do when they make loans is to accept promissory notes in exchange for credits to the borrowers' transaction accounts. Loans (assets) and deposits (liabilities) both rise by $9,000. Reserves are unchanged by the loan transaction, but the deposit credits constitute new additions to the total deposits of the banking system. *See*

3 Dollar amounts used in the various illustrations do not necessarily bear any resemblance to actual transactions. For example, open market operations typically are conducted with many dealers and in amounts totaling several billion dollars. back

4 Indeed, many transactions today are accomplished through an electronic transfer of funds between accounts rather than through issuance of a paper check. Apart from the time of posting, the accounting entries are the same whether a transfer is made with a paper check or electronically. The term "check," therefore, is used for both types of transfers. back

5 For each bank, the reserve requirement is 3 percent on a specified base amount of transaction accounts and 10 percent on the amount above this base. Initially, the Monetary Control Act set this base amount - called the "low reserve tranche" - at $25 million, and provided for it to change annually in line with the growth in transaction deposits nationally. The low reserve tranche was $41.1 million in 1991 and $42.2 million in 1992. The Garn-St. Germain Act of 1982 further modified these requirements by exempting the first $2 million of reservable liabilities from reserve requirements. Like the low reserve tranche, the exempt level is adjusted each year to reflect growth in reservable liabilities. The exempt level was $3.4 million in 1991 and $3.6 million in 1992. back

# Deposit Expansion

## 1. When the Federal Reserve Bank purchases government securities, bank reserves increase. This happens because the seller of the securities receives payment through a credit to a designated deposit account at a bank (Bank A) which the Federal Reserve effects by crediting the reserve account of Bank A.

|  | FR BANK |  | BANK A |
|---|---|---|---|
| **Assets** | **Liabilities** | **Assets** | **Liabilities** |
| US govt securities.. +10,000 | Reserve acct. Bank A.. +10,000 | Reserves with FR Banks.. +10,000 | Customer deposit.. +10,000 |

*The customer deposit at Bank A likely will be transferred, in part, to other banks and quickly loses its identity amid the huge interbank flow of deposits.* back

## 2. As a result, all banks taken together now have "excess" reserves on which deposit expansion can take place. back

Total reserves gained from new deposits.......10,000
less: required against new deposits (at 10%)... 1,000
equals: Excess reserves . . . . . . . . . . . . . . . . 9,000

### *Expansion - Stage 1*

## 3. Expansion takes place only if the banks that hold these excess reserves (Stage 1 banks) increase their loans or investments. Loans are made by crediting the borrower's account, i.e., by creating additional deposit money. back

STAGE 1 BANKS

**Assets**                                    **Liabilities**

# Kahrl Wutscher LLP

The Loop Center Building
105 W. Madison Street
Suite 2100
Chicago, Illinois 60602
Tel. (312) 416-6170
Fax (866) 581-9302
www.kw-llp.com

**Travis J. Eliason**
*Associate Attorney*
Direct (312) 546-3902
TEliason@kw-llp.com

**Via Regular Mail**

November 11, 2010

John J. Korman
934 SW 21st Way
Boca Raton, FL 33486

RE:    **Aurora Loan Services LLC – Loan No. 0039153879**
        **Borrower: John J. Korman**
        *SETTLEMENT PURPOSES ONLY*

Dear Mr. Korman:

    We represent Aurora Loan Services LLC ("Aurora") in connection with the above-named matter. This law firm and its lawyers are not debt collectors, and this is not an attempt to collect any debt. However, any information obtained may be used for the purpose of debt collection.

    We previously denied your allegations and declined to accept your demands relating to the above-referenced mortgage loan. Nevertheless, we provided you with a loan modification workout letter and loss mitigation package from Aurora in communications dated March 24, 2010, April 23, 2010, September 21, 2010 and October 25, 2010, and asked that you complete these materials and return them to us. We also attempted to reach you by telephone on October 25, 2010 regarding your submission of a loan modification application. However, we have not received a loan modification application package from you as to this matter.

    If you are interested in applying for a loan modification, please complete BOTH the HAMP and non-HAMP applications that are included with this letter. Please understand that Aurora will not be able to evaluate which, if any, loan modification program(s) you are eligible for until it has received both applications in completed form, including all supporting information and documentation requested by each application.

    Should you decide to submit a loan modification application, please return the applications and all supporting documentation directly to Kahrl Wutscher, 105 W. Madison Street, Suite 2100, Chicago, IL 60602. Alternatively, you may fax or email the package to the above fax number or email address.

# Kahrl Wutscher LLP

**Travis Eliason**
*Associate Attorney*
Page 2 of 2

Time is of the essence.  Aurora will not postpone or suspend foreclosure proceedings, if any, while it awaits your delivery of a completed loan modification application.  If a foreclosure sale has been scheduled, the completed applications, including all supporting information and documentation, must be received by Aurora at least five (5) business days prior to the foreclosure sale date to allow Aurora time to review the applications.

Sincerely,

Travis Eliason
*Associate Attorney*

Enc.

Exhibit M, pg 2 of 2



**Aurora • Loan Services**

P.O. Box 1706
Scottsbluff, NE 69363-1706

www.myAuroraLoan.com

7107 8381 6540 8248 8745

October 19, 2010

 3-704-52357-0003726-001-1-000-000-000-000

3640039153879534LM55010-19-10

John J Korman
934 SW 21st Way
Boca Raton FL 33486-5238

You may be able to make your payments more affordable.
Act Now to get the help you need!

RE:  HAMP Solicitation
     Loan No. 0039153879
     Property Address: 934 Sw 21st Way, Boca Raton FL 33486

Dear Customer(s):

There is help available if you are having difficulty making your mortgage
loan payments.  You may be eligible for the Home Affordable Modification
Program (HAMP), part of the initiative announced by President Obama to
help homeowners.

As your mortgage loan servicer (Aurora Loan Services LLC, Aurora Loan
Services, us, we), we will work with you in an effort to make your
mortgage payment affordable.  You will not pay any fees to take
advantage of this opportunity to modify your mortgage loan payment and
keep your home. Now is the time to act.  We are ready to help you.

Here's how it works: We will first determine if you are eligible based on
your situation.  To conduct this evaluation, we need you to submit an
Initial Package consisting of:

1.  Fully completed and signed Request for Modification and Affidavit
    form (RMA) and addendum

2.  Fully completed and signed IRS form 4506-T (Request for Transcript
    of Tax Return) for each borrower. Borrowers who filed their tax
    returns jointly may send in one IRS Form 4506-T signed and dated
    by both of the joint filers and

3.  Documentary evidence of all income.
    a) For all borrowers - A copy of your most recently filed signed
       federal tax return with all schedules, including Schedule
       E-Supplemental Income and Loss and Schedule C-Profit and Loss
       from Business
    b) For each borrower who receives a salary or hourly wages - Copies
       of your two most recent pay stubs that show year-to-date earnings
    c) For each borrower who is self-employed - A copy of the most
       recent quarterly or year-to-date profit/loss statement
    d) For each borrower who has income such as social security,
       disability or death benefits, pension, adoption assistance,
       or public assistance -

                                    Continued on reverse side

## Exhibit N, pg 1 of 5

Loan No. 0039153879                                                    Page 2

       i) A copy of the benefits statement or letter from the
          provider that states the amount, and
       ii) Copies of the two most recent bank statements showing
          receipt of such payment
    e) For each borrower who is relying on alimony, child support or
     separation maintenance as qualifying income*-
       i) A copy of the divorce decree, separation agreement, other
          written agreement filed with the court that states the
          amount and frequency, and
       ii) Copies of the two most recent bank statements showing
          receipt of such payment
 *You are not required to disclose child support, alimony or
   separation maintenance income, unless you choose to have it
   considered by your servicer.
    f) For each borrower who has rental income - Copies of the most
     recently filed signed federal tax return with all schedules,
     including the Schedule E-Supplement Income and Loss
     Note:  For borrowers with rental properties, only 75% of the
     gross rents will be used for qualifying income under this program
    g) For each borrower who has non-wage income (part time employment,
     bonuses, tips and investment income)- A copy of the documentation
     describing the nature of the income (e.g., an employment contract
     or printouts documenting tip income).

If you have other types of income, cannot locate the required
documents, or have questions about the paperwork required, please
contact us toll free at 1-800-550-0509.  Also, the RMA and 4506-T
forms are available for downloading at www.myauroraloan.com or will
be mailed to you after you indicate your interest in this foreclosure
alternative option.

If you are eligible, we will look at your monthly income and housing
costs, including any past due payments, and then determine an affordable
mortgage payment.

At first, you will make new, affordable monthly payments on your mortgage
loan during a trial period. If you make those payments successfully and
fulfill all Trial Period Plan conditions, we will permanently modify your
mortgage loan.

The modification may involve some or all of the following changes to your
mortgage loan: 1) Bringing your account current; 2) Reducing the interest
rate on your mortgage loan; 3) Extending the term of the loan, and/or
4) delaying your repayment of a portion of the mortgage principal until
the end of the loan term.

If we determine after our final review that you do not qualify for the
Home Affordable Modification Program, we will discuss other foreclosure
alternative options.

Exhibit N, pg 2 of 5

Loan Number 0039153879                                    Page 3

STEP 1: GATHER THE INFO WE NEED TO HELP YOU
To take advantage of this opportunity and the Home Affordable Modification
Program, contact us as soon as possible.  To help speed the process it
will be helpful if you have the following information when you call:
* Loan number
* Monthly pre-tax income of each borrower
* Information about any financial hardship you are suffering
* If your loan is not escrowed for the payment of taxes and insurance,
  we will need the annual property tax amount and the annual premium
  for your hazard insurance and flood insurance, if applicable
* Your monthly Homeowners Association payment, if applicable

If you do not qualify for a loan modification under this program, or do
not want to stay in your home, we will work with you to explore other
foreclosure alternative options available to help you keep your home or
ease your transition to a new home.

STEP 2: CONTACT US
We want to make modifying your mortgage loan as easy as possible.
However, you must take the first step by contacting us toll free at
866-924-3857.
You may also write to us at the address at the top of this letter.  Be
sure to include the information listed above. If you have any questions,
please contact one of our Foreclosure Prevention Specialists by calling
toll free at 866-924-3857 between the hours of 8 a.m. ET and 11 p.m. ET.

IMPORTANT NOTICE - We want to help you avoid foreclosure scams.
             Beware of Foreclosure Rescue Scams.  Help is free!
*There is never a fee to get assistance or information about the Making Home
 Affordable Program from your lender or a HUD-approved housing counselor.
   - For a HUD-approved counselor, visit:
     http://www.hud.gov/offices/hsg/sfh/hcc/fc/
*Beware of any person or organization that asks you to pay a fee in
 exchange for housing counseling services or modification of a
 delinquent loan.
*Beware of anyone who says they can "save" your home if you sign or
 transfer over the deed to your house. Do not sign over the deed to your
 property to any organization or individual unless you are working
 directly with your mortgage company to forgive your debt.
*Never make your mortgage payments to anyone other than your mortgage
 company without their approval.

Sincerely,
Aurora Loan Services

Enclosures: Important Notice, Important Notice Regarding Credit Bureau
            Reporting Related to HAMP Trial Period Plan
Aurora Loan Services is a debt collector. Aurora Loan Services is
attempting to collect a debt and any information obtained will be
used for that purpose. However, if you are in bankruptcy or received
a bankruptcy discharge of this debt, this communication is not an
attempt to collect the debt against you personally, but is notice
of a possible enforcement of the lien against the collateral property.

Exhibit N, pg 3 of 5

IMPORTANT NOTICE

If a duly-noticed foreclosure sale has been scheduled, any approval of a foreclosure alternative option is contingent upon the ability of Aurora Loan Services LLC (Aurora Loan Services) to have the pending foreclosure sale postponed or cancelled.

Aurora Loan Services is a debt collector. Aurora Loan Services is attempting to collect a debt and any information obtained will be used for that purpose. However, if you are in bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally, but is notice of a possible enforcement of the lien against the collateral property.

Exhibit N, pg 4 of 5

Important Notice Concerning Credit Bureau Reporting Related to the
HAMP Trial Period Plan ("Plan")

When you begin a Plan, Aurora Loan Services LLC (Aurora Loan Services)
will cease reporting the repayment status of your loan monthly to
credit bureaus during the term of the Plan. If the Plan is completed
successfully, and if a final modification of your loan is approved,
Aurora Loan Services will report the repayment status of your loan
to the credit bureaus under the terms of the loan modification.

If the Plan is not successfully completed, or if a final modification is
not approved, Aurora Loan Services will resume reporting the repayment
status of your loan to the credit bureaus based on the contractual
status of your loan at the time the Plan was not completed, or a final
modification of your loan was not approved. This means that if the Plan
payment amounts were less than the contractual payments due on your
loan, and you do not bring your loan contractually current at the time
the Plan is not completed or a final modification of your loan is not
approved, the records of the credit bureaus may reflect the repayment
status of your loan as contractually delinquent during the Plan period.
NOTE: This means that the records of the credit bureaus may reflect
the repayment status of your loan as contractually delinquent during
the Plan period even if you were making the payments required by
the Plan agreements.

Aurora Loan Services is a debt collector. Aurora Loan Services is
attempting to collect a debt and any information obtained will be
used for that purpose. However, if you are in bankruptcy or received
a bankruptcy discharge of this debt, this communication is not an
attempt to collect the debt against you personally, but is notice
of a possible enforcement of the lien against the collateral property.

Exhibit N, pg 5 of 5

# Kahrl Wutscher LLP

The Loop Center Building
105 W. Madison Street
Suite 2100
Chicago, Illinois 60602
Tel. (888) 339-5282
Fax (866) 581-9302
www.kw-llp.com

**Emily Garrison**
EGarrison@kw-llp.com

September 1, 2010                                                                **Via Regular Mail**

John J. Korman
934 SW 21st Way
Boca Raton, FL 33486

**RE:    Various Communications**
       **Borrowers: John J. Korman and Pamela Korman**
       **Property Location: 934 SW 21st Way, Boca Raton, FL 33486**
       **Loan No. 0039153879**

Dear John J. Korman:

        As you recall, we represent Aurora Loan Services LLC ("Aurora") in connection with the above-named matter. This law firm and its lawyers are not debt collectors, and this is not an attempt to collect any debt. However, any information obtained may be used for the purpose of debt collection. This letter responds to your untitled communications purportedly dated July 12, 2010 and July 19, 2010, copies of which are included here for your convenience.

        We previously provided you with various documents, information and disclosures in writing on March 24, 2010, April 23, 2010, May 18, 2010, June 9, 2010 and July 12, 2010, and ask again that you please review those items carefully.  We believe your concerns were addressed in our prior correspondence, and the documents and information we provided with it. A copy of our prior correspondence is included again here for your ease of reference.

        In addition, we included with our prior correspondence a complete copy of the loan origination file for the loan referenced above, including without limitation copies of the note, security instrument, disclosures, application materials, credit reports, underwriting documents, appraisals, and closing documents. We also included with our prior correspondence a detailed payment history for that loan.  We also described the current holder and servicer of the debt, the name of the current owner of the debt, the name and address of the original creditor, and provided additional information and documentation evidencing or otherwise verifying the debt. In short, we provided you with extensive information and documentation regarding the ownership, origination, and servicing of the loan, in clear and concise language.

        Please note that requests to Aurora must relate to the servicing of the subject home loan and should include a statement of the reasons you believe the account is in error. In reviewing your communication(s), you do not appear to make any requests or raise any issues related to the

CALIFORNIA - ILLINOIS - WASHINGTON, D.C.

# Kahrl Wutscher LLP

**Emily Garrison**
Page 2 of 2

servicing of the subject loan and instead assert incorrect and unsupportable allegations relating solely to supposed acts and omissions of persons or entities other than Aurora. We further note that your communication(s) and related allegations again fail to mention any issue or purported error relating to the servicing of the mortgage loan referenced above. To the extent that statements in your letter consist of allegations of wrongdoing of any nature by Aurora or otherwise, Aurora denies your allegations, and respectfully requests that you review the documents and information provided with this and/or any previous correspondence for further explanation and clarification.

Nevertheless, subject to and without waiving any objections, Aurora responds to your alleged additional requests as follows:

**Request:** *"Who is Aurora Loan Services LLC servicing the above-referenced account for?"*

**Response:** Subject to and without waiving any objections, Aurora states that it previously provided to you the name of the current owner of the subject loan and states again here that the name of the current owner of the debt is: Lehman Brothers Holdings Inc. 745 Seventh Ave., 7th Floor, New York, NY 10019.

It is Aurora's position that its previous responses, as well as the documentation, information, and disclosures provided therewith, have been responsive to all of your inquiries. Therefore, Aurora will not respond to any further communications from you that merely repeat your prior requests, demands or allegations or which are vague and ambiguous. However, if you have new concerns relating to the servicing of the above-referenced loan account, please describe your concerns in writing to us at the address and/or fax number above by specifically indicating the reasons you believe the account is in error.

Aurora states that, subject to and without waiving any objections, it reserves any and all rights and powers of sale afforded to it by the note and security instrument related to the above referenced loan account and property, subject to applicable state and federal law.

Due to the nature of your communications, we strongly recommend that you consult with a local attorney about your home loan rights, obligations and liabilities. If you already have legal counsel representing you, please provide their contact information so that further communications can be sent directly to that individual.

Sincerely,

Emily Garrison

Enc.

2

Exhibit O, pg 2 of 2

John Korman
934 SW 21 Way
Boca Raton Florida 33486

July 22, 2008
Aurora Loan Services
2617 College Park Drive
Scottsbluff NE 69361
Attention Correspondence

Sent Certified Mail # 7008 0150 0001 2475 1319

Dear Correspondence;

To Whom It May Concern:

This letter is being sent to you in response to the repeated phone calls to my
home. Be advised that the Settlor of the mortgage has discharged it, Go to
http://www.co.palm-beach.fl.us/ then lookup public records, under my
name.

This notice is also being sent pursuant to the Fair Debt Collection Practices
Act, **15 USC 1692g Sec. 809 (b)** that your claim is disputed and validation is
now being requested to align our accounting.

This is NOT a request for "verification" or proof of my mailing address, but
a request for VALIDATION made pursuant to the above named Title and
Section. I respectfully request that your offices provide me with competent
evidence that I have any legal obligation to pay you.

At this time I will also inform you that if your offices have reported
invalidated information to any of the 3 major Credit Bureaus (Equifax,
Experian or Trans Union) this action might constitute fraud under both
Federal and State Laws. Due to this fact, if any negative mark is found on
any of my credit reports by your company or the company that you represent
I will consider bringing legal action against you for the following:

Violation of the Fair Credit Reporting Act.
Violation of the Fair Debt Collection Practices Act.
Defamation of Character.

Exhibit P, pg 1 of 2

If your offices are able to provide the proper documentation as requested in the following Declaration, I will require at least 30 days investigating this information and during such time all collection activity must cease and desist.

Also during this validation period, if any action is taken which could be considered detrimental to any of my credit reports, I will consult with my legal counsel for suit. This includes any listing any information to a credit reporting repository that could be inaccurate or invalidated or verifying an account as accurate when in fact there is no provided proof that it is.

If your offices fail to respond to this validation request within 30 days from the date of your receipt, all references to this account must be deleted and completely removed from my credit file and a copy of such deletion request shall be sent to me immediately.

I would also like to request, in writing, that no telephone contact be made by your offices to my home or to my place of employment. If your offices attempt telephone communication with me, including but not limited to computer generated calls and calls or correspondence sent to or with any third parties, it will be considered harassment and I will have no choice but to expose this illegal activity to the Federal Trade Commission. All future communications with me MUST be done in writing and sent to the address noted in this letter by USPS.

It would be advisable that you assure that your records are in order. This is an attempt to correct your records; any information obtained shall be used for that purpose.

Best Regards,


/S/ John Korman

Exhibit P, pg 2 of 2

# Explanation of Securitization

Richard
Kessler

**Introduction**

Securitization takes a commonplace, mundane transaction and makes very strange things happen. This explanation will show that, in the case of a securitized mortgage note, there is no party who has the lawful right to enforce a foreclosure, and the payments alleged to have been in default have, in fact, been paid to the party to whom such payments were due.

Additionally, in the case of a securitized note, there are rules and restrictions that have been imposed upon the purported debtor that are extrinsic to the note and mortgage[*] as executed by the mortgagor and mortgagee, rendering the note and mortgage unenforceable.

This explanation, including its charts, will demonstrate how securitization is a failed attempt to use a note and a mortgage for purposes for which neither was ever intended.

Securitization consists of a four way amalgamation. It is partly 1) a refinancing with a pledge of assets, 2) a sale of assets, 3) an issuance and sale of registered securities which can be traded publicly, and 4) the establishment of a trust managed by third party managers. Enacted law and case law apply to each component of securitization. However, specific enabling legislation to authorize the organization of a securitization and to harmonize the operation of these diverse components does not exist.

Why would anyone issue securities collateralized by mortgages using the structure of a securitization? Consider the following benefits. Those who engage in this practice are able to...

1. Immediately liquidate an illiquid asset such as a 30 year mortgage.

2. Maximize the amount obtained from a transfer of the mortgages and immediately realize the profits now.

3. Use the liquid funds to enter into new transactions and to earn profits that are immediately realized... again and again (as well as the fees and charges associated with the new transactions, and the profits associated with the new transactions... and so on).

4. Maximize earnings by transferring the assets so that the assets cannot be reached by the creditors of the transferor institution or by the trustee in the event of bankruptcy. (By being "bankruptcy-remote" the value to investors of the illiquid assets is increased and investors are willing to pay more.)

5. Control management of the illiquid asset in the hands of the transferee by appointing managers who earn service fees and may be affiliated with the transferor.

6. Be able to empower the transferor by financially supporting the transferred asset by taking a portion of the first losses experienced, if any, from default, and entering into agreements to redeem or replace mortgages in default and to commit to providing capital contributions,

Exhibit Q

if needed, in order to support the financial condition of the transferee [In other words, provide a 100% insured protection against losses].

7. Carry the reserves and contingent liability (for the support provided in paragraph 6) off the balance sheet of the transferor, thereby escaping any reserve requirements imposed upon contingent liabilities that would otherwise be carried on the books.

8. Avoid the effect of double taxation of, first, the trust to which the assets have allegedly been transferred and, second, the investor who receives income from the trust.

9. Insulate the transferor from liability and moves the liability to the investors.

10. Leverage the mortgage transaction by creating a mortgage backed certificate that can be pledged as an asset which can be re-securitized and re-pledged to create a financial pyramid.

11. Create a new financial vehicle so mind numbingly complicated that almost no one understands what is going on.

The obvious benefit of the above #11 is that courts are predisposed to *dis*believe the allegation that a securitized note is no longer enforceable. To a reasonable person, the claim that a mortgage note is unenforceable merely because it has been securitized does sound somewhat outlandish. And frankly, the more complex and difficult the securitized arrangement is to explain and perceive, the more likely a judgment in favor of the "lender" will be in litigation.

Simply stated, the vast majority of litigants – and judges – have not been properly informed as to the true nature of this type of transaction. This is said not to insult anyone. Quite to the contrary, this is just to say that the true identity of the real party in interest is able to be obfuscated in the labyrinth of the securitization scheme such that whoever steps forward claiming to be that party and showing documentation appearing to be legitimate is assumed to have standing, and there are too few knowledgeable challengers of that mistaken assumption.

So much more so in the case of the "layman" homeowner. Most homeowners have no idea that the transaction being referred to as a debt and as an obligation that they must pay or be subject to foreclosure, has actually already been paid. And not just once! In cases where a default has been alleged, the securitized note has likely already been satisfied (not just sold and/or assigned) four or five times over.

Securitization is a product of the genius of capitalism. As long as profits continued to be made, all participants did very well from this creative new financial arrangement, and bliss reigned supreme. Then the other shoe dropped.

There is a mortgage default crisis underway in the United States and a credit crisis caused by toxic assets in the secondary mortgage market. Goldman Sachs estimates that, starting at the end of the last quarter of 2008 through 2014, 13 million foreclosures will occur. The Center for Responsible Lending, based on industry data, predicted 2.4 million foreclosures occurred in 2009, and that there would be a total of 9 million foreclosures between 2009 and 2012. At the end of the first quarter of 2009, more than 2 million houses were in foreclosure. Mortgage Bankers' Ass'n, Nat'l Delinquency Survey Q109 at 4 (2009) reporting that 3.85% of 44,979,733, or 1.7 million,

mortgages being serviced were in foreclosure. Roughly half of these were serviced by national banks or federal thrifts. Over twelve percent of all mortgages had payments past due or were in foreclosure and over 7% were seriously delinquent—either in foreclosure or more than three months delinquent.

These spiraling foreclosures weaken the entire economy and devastate the communities in which they are concentrated. According to *The Subprime Lending Crisis: The Economic Impact on Wealth, Property Values and Tax Revenues, and How We Got Here*, foreclosed home owners are projected to lose $71 billion due to foreclosure crisis, while neighbors will lose $32 billion, and state and local governments will lose $917 million in property tax revenue.

## What is a Securitization?

In the mortgage securitization process, collateralized securities are issued by, and receive payments from, mortgages collected in a collateralized mortgage pool. The collateralized mortgage pool is treated as a trust. This trust is organized as a special purpose vehicle ("SPV") and a qualified special purpose entity ("QSPE") which receives special tax treatment. The SPV is organized by the securitizer so that the assets of the SPV are shielded from the creditors of the securitizer and the parties who manage it. This shielding is described as making the assets "bankruptcy remote".

To avoid double taxation of both the trust and the certificate holders, mortgages are held in Real Estate Mortgage Investment Conduits ("REMICS"). To qualify for the single taxable event, all interest in the mortgage is supposed to be transferred forward to the certificate holders.

The legal basis of REMICs was established by the Tax Reform Act of 1986 (100 Stat. 2085, 26 U.S.C.A. §§ 47, 1042), which eliminated double taxation from these securities. The principal advantage of forming a REMIC for the sale of mortgage-backed securities is that REMIC's are treated as pass-through vehicles for tax purposes helping avoid double-taxation. For instance, in most mortgage-backed securitizations, the owner of a pool of mortgage loans (usually the Sponsor or Master Servicer) sells and transfers such loans to a QSPE, usually a trust, that is designed specifically to qualify as a REMIC, and, simultaneously, the QSPE issues securities that are backed by cash flows generated from the transferred assets to investors in order to pay for the loans along with a certain return. If the special purpose entity, or the assets transferred, qualify as a REMIC, then any income of the QSPE is "passed through" and, therefore, not taxable until the income reaches the holders of the REMIC, also known as beneficiaries of the REMIC trust.

Accordingly, the trustee, the QSPE, and the other parties servicing the trust, *have no legal or equitable interest in the securitized mortgages*. Therefore, any servicer who alleges that they are, or that they have the right, or have been assigned the right, to claim that they are the agent for the holder of the note for purposes of standing to bring an action of foreclosure, are stating a legal impossibility. Any argument containing such an allegation would be a false assertion. Of course, that is exactly what the servicer of a securitized mortgage that is purported to be in default claims.

The same is the case when a lender makes that same claim. The party shown as "Lender" on the mortgage note was instrumental in the sale and issuance of the certificate to certificate holders, which means they knew that they were not any longer the holder of the note.

Exhibit Q

The QSPE is a weak repository and is not engaged in active management of the assets. So, a servicing agent is appointed. Moreover, *all legal and equitable interest in the mortgages are required by the REMIC to be passed through to the certificate holders.* Compliance with the REMIC and insulating the trust assets from creditors of third parties (who create or service the trust) leads to unilateral restructuring of the terms and conditions of the original note and mortgage.

The above fact, and the enormous implications of it, cannot be more emphatically stressed.

A typical mortgage pool consists of anywhere from 2,000 to 5,000 loans. This represents millions of dollars in cash flow payments each month from a servicer (receiving payments from borrowers) to a REMIC (QSPE) with the cash flow "passing through", tax-free, to the trust (REMIC). Those proceeds are not taxed until received as income to the investors. Only the investors have to pay taxes on the payments of mortgage interest received.

The taxes a trust would have to pay on 30, 50, or 100 million dollars per year if this "pass through" taxation benefit didn't exist would be substantial and it would, subsequently, lower the value of the certificates to the investors, the true beneficiaries of these trusts. Worse, what would be the case if a trust that was organized in February 2005 were found to have violated the REMIC guidelines outlined in the Internal Revenue Code? At $4 million per month in cash flow, there would arise over $200 million in income that would now be considered taxable.

It is worth repeating that in order for one of these investment trusts to qualify for the "pass through" tax benefit of a REMIC (in other words, to be able to qualify to be able to be referred to as a REMIC), *ALL LEGAL AND EQUITABLE INTEREST IN THE MORTGAGES HELD IN THE NAME OF THE TRUST ARE VESTED IN THE INVESTORS,* not in anyone else *AT ANY TIME.* If legal and/or equitable interest in the mortgages held in the name of the trust are claimed by anyone other than the investors, those that are making those claims are either defrauding the investors, or the homeowners & courts, or both.

So, if the trust, or a servicer, or a trustee, acting on behalf of the trust, is found to have violated the very strict REMIC guidelines (put in place in order to qualify as a REMIC), the "pass through" tax status of the REMIC can be revoked. This, of course, would be the equivalent of financial Armageddon for the trust and its investors.

A REMIC can be structured as an entity (i.e., partnership, corporation, or trust) or simply as a segregated pool of assets, so long as the entity or pool meets certain requirements regarding the composition of assets and the nature of the investors' interests. No tax is imposed at the REMIC level. To qualify as a REMIC, all of the interests in the REMIC must consist of one or more classes of "regular interests" and a single class of "residual interests."

Regular interests can be issued in the form of debt, stock, partnership interests, or trust certificates, or any other form of securities, but *must provide the holder the unconditional right to receive a specified principal amount and interest payments.* REMIC regular interests are treated as debt for federal tax purposes. A residual interest in a REMIC, which is any REMIC interest other than a regular interest, is, on the other hand, taxable as an equity interest.

According to Section 860 of the Internal Revenue Code, in order for an investment entity to qualify as a REMIC, all steps in the "contribution" and transfer process (of the notes) must be true and

Exhibit Q

complete sales between the parties and must be accomplished within the three month time limit from the date of "startup" of the entity. Therefore, every transfer of the note(s) must be a true purchase and sale, and, consequently the note must be endorsed from one entity to another. Any mortgage note/asset identified for inclusion in an entity seeking a REMIC status must be sold into the entity within the three month time period calculated from the official startup day of the REMIC.

Before securitization, the holder of an enforceable note has a financial responsibility for any possible losses that may occur arising from a possible default, which means that holder also has the authority to take steps to avoid any such losses (the right to foreclose). Securitization, however, effectively severs any such financial responsibility for losses from the authority to incur or avoid those losses.

With securitization the mortgage is converted into something different from what was originally represented to the homeowner. For one thing, since the party making the decision to foreclose does not actually hold any legal or equitable interest in any securitized mortgage, they have not realized any loss or damages resulting from the purported default. Therefore, it also follows that the foreclosing party avoids the liability which could result if a class of certificate holders claimed wrongful injury resulting from a modification made to achieve an alternate dispute resolution.

Securitization also makes the mortgage and note unalienable. The reason is simple: once certificates have been issued, the note cannot be transferred, sold or conveyed; at least not in the sense that such a transfer, sale, or conveyance should be considered lawful, legal, and legitimate. This is because the securitized note forever changes the nature of that instrument in an irreversible way, much in the same way that individual strawberries and individual bananas can never be extracted, in their "whole" form, from a strawberry banana milkshake once they've been dropped in the blender and the blending takes place.

It might appear that the inability to alienate the note has no adverse consequences for the debtor, but recent history disproves this notion. Several legislative and executive efforts to pursue alternate dispute resolution and to provide financial relief to distressed homeowners have been thwarted by the inability of the United States government to buy securitized mortgages without purchasing most of the certificates issued.

An SPV cannot sell any individual mortgage because individual mortgages are not held individually by the certificate holders; the thousands of mortgages held in the name of the REMIC are owned *collectively* by the certificate holders. Likewise, the certificate holders cannot sell the mortgages. All the certificate holders have are the securities, each of which can be publicly traded.

The certificate holders are, in no sense, holders of any specific individual note and have no legal or beneficial interest in any specific individual note. The certificate holders do not each hold undivided fractional interests in a note which, added together, total 100%. The certificate holders also are not the assignees of one or more specific installment payments made pursuant to the note.

For the certificate holder, there is no note. A certificate holder does not look to a specific note for their investment's income payment. Instead, the certificate holder holds a security similar to a bond with specific defined payments. The issuer of trust certificates is selling segments of cash flow.

Exhibit Q

The concept of securitization is brilliant. It began as a simple idea; a way to convert illiquid, long term debt into liquid, tradable short term debt. It cashes out the lender, allowing the lender to make new "loans" while realizing an immediate profit on the notes sold.

**The Charts**

In order to more easily identify the parties and their relationship to the securitization arrangement, it is useful to view it in diagram form. The parties to a securitization and their relationships to each other, including the duties and obligations one party owes to another party, is referred to on Wall Street as "The Deal". The Deal is created and defined by what functions as a declaration of trust, also known as "the master servicing and pooling agreement", hereafter "pooling agreement".

Chart 1 below shows a Net Asset Trust created to convert long term mortgage debt into short term, publicly traded securities.

Chart 1



**Asset Trust**

The transferor purchases a portfolio of mortgages and sells them to a trust. The trust purchases the mortgages. The trustee holds the mortgages and becomes the holder of legal title. The trust then

Exhibit Q

issues a bond to the investors; debenture-like certificates. The bond issues different classes of certificates, called tranches.

The certificate entitles the certificate purchaser to certain stated, repeated segments of cash flow paid by the trust. The certificate holders do not hold fractional, undivided interest in the mortgages. Instead, each tranche is entitled to an identified, segmented pool of money payable in an order of priority. A senior tranche will get paid before a junior tranche. A junior rate provides a higher promised rate of return because it has a higher risk than a senior tranche. Another tranche exists that pays interest, but does not pay out principal.

The type and variety of tranche that is created is limited only by the limits of financial ingenuity. Tranches have been created which pay only a portion of principal repaid on the mortgages but no interest.

The investors buy the mortgages from the transferor by paying cash to the trustee who pays the transferor. The investors purchase securities (certificates) which are collateralized by the mortgages held in trust in the collateral pool. Legal title to the mortgages is held by the trustee and beneficial title is owned by the investors.

Only the extremely savvy debtor in this arrangement would know that he should perhaps begin to become concerned upon learning that his mortgage note had been sold to a trust and exchanged for certificates that are issued to unknown beneficiaries (investors) whose certificates were issued under one of many different types of tranches. However, the debtors – the homeowners; the people who provide the income that funds the entire securitization scheme – have no say in the matter because they are never told what will be done with their note. It is never disclosed in the transaction.

So, whereas it would take an extremely savvy person to understand why this arrangement is potentially troublesome to the homeowner whose note has been used in this way, it would take an omniscient homeowner to know that securitization is even going on in the first place. For reasons already stated above, it is not only disingenuous to suggest that securitization does not affect the rights of the debtor, it is downright dishonest.

Nevertheless, for purposes of breaking down the topic into bite-sized pieces: suffice it to say that the trust purchased mortgages and sold certificates. Another way to describe it: the trust bought cattle and wound up selling ground beef.

This then raises questions suitable for a law school examination or law journal article: *Are the purchasers of these certificates really beneficial holders of the note, or are they merely purchasers of a contract right to payment from the trust?* In other words, *Is the trustee limited to being the holder of legal title, or does the trustee also hold the beneficial title?* While these may be good questions for an academic exercise, they aren't germane to defending the debtor being sued in foreclosure. The reason is that under either case, the trustee has standing to foreclose.

More germane is the fact is that an asset trust is likely *not* the type of securitization vehicle to hold a debtor's mortgage. This is because Wall Street decided to improve the "asset trust paradigm". If the Deal could be made safer for, and more lucrative to, the investor, the investor would pay more

for the investment. This was accomplished by adding objectives 2-11 to the list already referred to above, shown again below:

1. Immediately liquidate an illiquid asset such as a 30 year mortgage.

2. Maximize the amount obtained from a transfer of the mortgages and immediately realize the profits now.

3. Use the liquid funds to make new loans and earn profits that are immediately realized... again and again (as well as the fees and charges associated with making loans, and the profits associated with liquidating the new loans as quickly as practicable... and so on).

4. Maximize earnings by transferring the assets so that the assets cannot be reached by the creditors of the transferor institution or by the trustee in the event of bankruptcy. (By being "bankruptcy-remote" the value to investors of the illiquid assets is increased and investors are willing to pay more.)

5. Control management of the illiquid asset in the hands of the transferee by appointing managers who earn service fees and may be affiliated with the transferor.

6. Be able to empower the transferor to support the transferred asset by taking a portion of the first losses experienced, if any, from default, entering into agreements to redeem or replace mortgages in default and commit to providing capital contributions, if needed, in order to support the financial condition of the transferee.

7. Carry the reserves and contingent liability for the support provided in paragraph 6 off the balance sheet of the transferor, thereby escaping any reserve requirements imposed upon contingent liabilities carried on the books.

8. Avoid the effect of double taxation of, first, the trust to which the assets have allegedly been transferred and, second, the investor who receives income from the trust.

9. Insulate the transferor from liability and moves the liability to the investors.

10. Leverage the mortgage transaction by creating a mortgage backed certificate that can be pledged as an asset which can be re-securitized and re-pledged to create a financial pyramid.

11. Create a new financial vehicle so mind numbingly complicated that almost no one understands what is going on.

The net asset trust structure does not provide the additional 10 benefits of securitization listed above (items 2 through 11). For instance, under the net asset trust, the income received by the collateral pool from the mortgage debtors is taxed and the interest paid to each investor is taxed again.

To achieve the goals listed above, it became necessary to structure the Deal to create a pass through trust and replace the net asset trust. As shown in Chart 2 shown below, the Deal starts off

on straight forward easily charted path. The path of the mortgages identifies the note holder at each stage...

Chart 2



1. **ORIGINATOR.** The Transaction takes place between the debtor (mortgagor) and the creditor here called the "originator" a.k.a. the mortgagee.  The transaction consists of the mortgage note and the mortgage. The originator becomes the note holder.

2. **WAREHOUSER.** The originator sells the transaction to the warehouser.  The warehouser then becomes the note holder.

3. **TRANSFEROR.** The warehouser buys the mortgage and also buys other mortgages to assemble a portfolio of mortgages. The portfolio is then sold to the transferor who is the initiating party of the securitization. The transferor then becomes the note holder. The transferor creates the securitization.

As previously stated, a portfolio for securitization typically contains from 2,000 to 5,000 mortgages.

Exhibit Q

There are many different structures for securitization but the potential negative impact of securitization on the debtor is the same. The chart on the following page shows a typical securitization.

Chart3

Exhibit Q



The structure seen above is called the "Deal". The Deal is created through a complex instrument that, among other things...

1. Serves as a declaration of trust,

2. Identifies the parties who manage the Deal and describes their duties, responsibilities, liabilities and obligations,

3.  Defines the different classes of investment securities, and

4.  Is called the Master Pooling and Servicing Agreement.

The instrument is filed with the Securities and Exchange Commission and is a public record. This document is the most important source for discovery as it provides the *who*, the *how*, the *where*, and the *when* of the Deal.

Chart 2 shows the mortgage portfolio in the hands of the transferor who *was* the note holder.

**The Transferor.** In the "new and improved" securitization process (shown in Chart 3), the transferor transfers the mortgages to the underwriter. In addition, the transferor may arrange for credit enhancements to be transferred for the benefit and protection of investors. Such enhancements may include liquid assets, other securities, and performing mortgages in excess of the mortgage portfolio being sold. NOTE: *the transferor also usually obligates itself to redeem and replace any mortgage in default.*

**The Underwriter.** The underwriter creates the securities and arranges to place the various tranches of securities (different classes of certificates) with investors. The underwriter then transfers the mortgage portfolio and securities to the issuer.

**The Issuer.** The issuer is organized as a Special Purpose Vehicle (SPV); a passive conduit to the investors. The issuer issues the securities to the investors and collects payment from the investors. The payments from the investors are transferred through the underwriter to the transferor.

**The QSPE.** The mortgage portfolio is conveyed from the issuer to the collateral pool which is organized as a Qualifying Special Purpose Entity ("QSPE"). As previously stated, what makes the entity "qualified" is strict adherence to a set of rules. Among other things, these rules make the QSPE a passive entity *which has no legal or equitable title to the mortgages in the mortgage portfolio and restrict modification of the mortgages in the portfolio.*

As a result, the QSPE provides to the investors the benefit of its earnings (paid to it by the mortgage debtors) not being taxed. These earnings flow through the QSPE to the investors. Only the investors are taxed at the individual level.

**Custodian.** The QSPE transfers the mortgage portfolio to the custodian who acts as a bailee of the assets. The custodian is a mere depository for safekeeping of the mortgages.

**Tranches.** The investors invest in different classes of securities. Each class is called a tranche. Each tranche is ranked by order of preference in receipt of payment and the segment of cash flow to be received and resembles a bond. The basic stratification by order of priority of payment from highest to lowest is categorized as follows: senior notes, mezzanine notes and unrated equity.

**Parties described in the Master Pooling and Servicing Agreement.** The Deal establishes a management structure to supervise the investment. The specific parties for a Deal are indentified in the master Pooling and Servicing Agreement which states their duties and obligations, their compensation, and their liability. Typically the managers include: the Master Servicer, the Trustee, the Subservicer, and the Custodian.

Exhibit Q

**Master Servicer.** The Master Servicer is in overall charge of the deal and supervises the other managing parties.

**Trustee.** The day to day operations of the collateral pool is administered by the trustee. However, the trustee does very little since the trust must remain passive. The trustee does not have a legal or equitable interest in any mortgage in the portfolio because the trust is a mere passive conduit.

**Subservicer.** The Subservicer is responsible for dealing with the property owners; collecting monthly payments, keeping accounts and financial records and paying the monthly proceeds to the trustee for distribution to the investors by order of tranche.

The Subservicer may also be responsible for foreclosure in the event a mortgage is in default or some deals call for the appointment of a special subservicer to carry out foreclosure. Usually the subservicer is obligated to make monthly advances to the investors for each mortgage in default. In addition, the subservicer may also have undertaken to redeem or replace any mortgage in default.

**Counterparty.** Finally, there is a counterparty to make sure that investors get paid on time. The counterparty is like an insurer or guarantor on steroids; a repository of all kinds of financial arrangements to insure payment to the investors. Such financial arrangements include derivatives, credit default swaps and other hedge arrangements.

The term "counterparty" is frequently associated with "counterparty risk" which refers to the risk that the counterparty will become financially unable to make the "claims" to the investors if there are a substantial number of mortgage defaults. The counterparty may guarantee the obligation of the transferor or servicer to redeem or replace mortgages in default. The counterparty may also guarantee the obligation of the subservicer to make monthly payments for mortgages that are said to be in default.


**Questions worth asking.** We now know that an examination of the Master Servicing and Pooling Agreement filed with the SEC will reveal substantial barriers to a lawful foreclosure. We also know that there are parties involved in this arrangement, as well as insurance products in place, intended to financially "cover" certain "losses" in certain situations, such as an alleged default.

In light of this, there are a few questions the Subservicer and/or the Successor Trustee and/or the foreclosure law firm who claims to have the legal right and authority to conduct a foreclosure, ought to be prepared to answer before the foreclosure goes forward:

- *Have you read, and are you familiar with, the Master Servicing and Pooling Agreement relating to this mortgage that was filed with the SEC?*

- *The Servicer, Subservicer, or some other party (counterparty) likely made a payment to the party who allegedly owns the purported debt obligation. This payment, if made, was intended to cover sums that are alleged to be in default. Therefore, the party who allegedly owns the purported debt obligation has, by virtue of that payment, not been damaged in any way. Therefore, if any sums have thusly been paid, how is it being truthfully stated that a default has occurred?*

Exhibit Q

- *If the investment trust that ostensibly owns the mortgage obligation is a REMIC, the trustee, the QSPE, and the other parties servicing the trust, have no legal or equitable interest in the securitized mortgages. Therefore, any servicer who alleges that they have the right, or that they have been assigned the right, to claim that they are the agent for the holder of the note for purposes of standing to bring an action of foreclosure, are stating a legal impossibility. In light of this, by what authority can you show that you can administer a lawful foreclosure?*

There are many more questions that can and should be asked in such a situation. They all stem from one central fact: a note that has been securitized and submitted to an entity qualifying as a REMIC and organized as a Qualifying Special Purpose Entity, is not enforceable. That is an incontrovertible fact that servicers of securitized mortgages will have to cope with as more and more homeowners discover the truth.


## Conclusion

Previously, it was stated that, in order for the investment entity to be a REMIC (in other words, in order for the entity to be able to qualify for the single taxable event as a pass through entity), all interest in the mortgage is supposed to be transferred forward to the certificate holders.

Well, in fact, *such a transfer never occurs.* Either that is the case, or the parties who state that they have a right to foreclose on a securitized note are not being truthful when they present themselves as the real party in interest.

In any case, they cannot have it both ways. The servicer cannot claim to hold legal and/or equitable interest in the mortgages held in the name of an investment trust that also provides the (REMIC) pass through tax benefit to its investors.

Does the Master Servicing Agreement – made public through its filing with the Securities and Exchange Commission – show that the entity is a REMIC? If so, the note has become unenforceable because the unnamed parties who are receiving the pre-tax income from the entity are the real parties in interest. They hold the legal and/or equitable interest in the mortgages held, but they do not have the ability to foreclose on any one individual mortgage because the mortgages held by the REMIC have all been bundled into one big income-producing unit.

The Introduction explains that securitization consists of a four way amalgamation. It is partly 1) a refinancing with a pledge of assets, 2) a sale of assets, 3) an issuance and sale of registered securities which can be traded publicly, and 4) the establishment of a trust managed by third party managers.

Also discussed is the fact that enacted law and case law apply to each component of securitization, but that specific enabling legislation to authorize the organization of a securitization, and to harmonize the operation of these diverse components, *does not exist.* This bears repeating even more explicitly because this is central to the rights of a homeowner facing foreclosure whose underlying mortgage has been securitized: *specific enabling legislation to authorize the pass through structure of a trust holding a mortgage portfolio does not exist.*

Many unresolved legal issues could be addressed if the Uniform Commercial Code Commissioners added a chapter for securitization. However, that has yet to happen.

So as it now stands, a lawful foreclosure cannot occur against a mortgage whose note has been securitized because of the lack of an actual damaged party who has standing to state a claim.


```
Richard Kessler is a graduate of Yale Law School
and a Washington, D.C. attorney.
documentaryclearinghouse.com
```

100025440003395388
0039153879

# NOTE

September 29, 2006                JUPITER
[Date]                                      [City]

934 SW 21ST WAY, BOCA RATON, FLORIDA 33486
[Property Address]

I HEREBY CERTIFY
THIS TO BE A TRUE
AND EXACT COPY
OF THE ORIGINAL.
ASSOCIATES LAND TITLE
X _____

**1  BORROWER'S PROMISE TO PAY**
   In return for a loan that I have received, I promise to pay U S $     650,000 00     (this amount is called "Principal"),
plus interest, to the order of the Lender  The Lender is

   LEHMAN BROTHERS BANK, FSB, A FEDERAL SAVINGS BANK
I will make all payments under this Note in the form of cash, check or money order
   I understand that the Lender may transfer this Note  The Lender or anyone who takes this Note by transfer and who is entitled
to receive payments under this Note is called the "Note Holder "

**2  INTEREST**
   Interest will be charged on unpaid principal until the full amount of Principal has been paid  I will pay interest at a yearly rate
of        6 875    %
   The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of
this Note

**3  PAYMENTS**
   **(A) Time and Place of Payments**
   I will pay principal and interest by making a payment every month
   I will make my monthly payment on the        first day of each month beginning on        December , 2006        I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before
Principal  If, on        November 1 , 2036           , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date "
   I will make my monthly payments at        LEHMAN BROTHERS BANK, FSB
400 PROFESSIONAL DRIVE, SUITE 500, GAITHERSBURG, MD 20879 or at a different place if required by the Note Holder

   **(B) Amount of Monthly Payments**
   My monthly payment will be in the amount of U S $     4,270 04

**4  BORROWER'S RIGHT TO PREPAY**            SEE ATTACHED ADDENDUM
   ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ as a
~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~
~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~
~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ my
~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ to
~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ of the
~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ the
~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

FLORIDA FIXED RATE NOTE-Single  Family- Fannie  Mae/Freddie  Mac UNIFORM INSTRUMENT

-SN(FL) (0005)            Form 3210 1/01
VMP MORTGAGE FORMS  (800)521-7291
Page 1 of 3                Initials

Exhibit Z, pg 1 of 4.

100025440003395388
0039153879

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from me which exceeded permitted limits will be refunded to me  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me  If a refund reduces Principal, the reduction will be treated as a partial Prepayment

**6  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of   **15**   calendar days after the date it is due, I will pay a late charge to the Note Holder  The amount of the charge will be   **5 00**   % of my overdue payment of principal and interest  I will pay this late charge promptly but only once on each late payment

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law  Those expenses include, for example, reasonable attorneys' fees

**7  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note  The Note Holder may enforce its rights under this Note against each person individually or against all of us together  This means that any one of us may be required to pay all of the amounts owed under this Note

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor  "Presentment" means the right to require the Note Holder to demand payment of amounts due  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid

Exhibit Z, pg 2 of 4

10002544000339538B
0039153879

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)          _____ (Seal)
JOHN J KORMAN                    -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower


*[Sign Original Only]*

-6N(FL) (0207)                              Page 2 of 3                    Form 3210 1/01

Exhibit Z, pg 3 of 4

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

## 11. DOCUMENTARY TAX

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)       _____ (Seal)
JOHN  J  KORMAN        -Borrower                                        -Borrower


_____ (Seal)       _____ (Seal)
                       -Borrower                                        -Borrower


_____ (Seal)       _____ (Seal)
                       -Borrower                                        -Borrower


_____ (Seal)       _____ (Seal)
                       -Borrower                                        -Borrower


PAY TO THE ORDER OF                     PAY TO THE ORDER OF
                                        LEHMAN BROTHERS HOLDINGS INC.
WITHOUT RECOURSE                        WITHOUT RECOURSE                [Sign Original Only]
LEHMAN BROTHERS HOLDINGS INC            LEHMAN BROTHERS BANK, FSB
BY:_____                     BY _____
PAUL E. SVEEN                           RICK W SKOGG
AUTHORIZED SIGNATORY                    VICE PRESIDENT

SN(FL) (0005)                           Page 7 of 7                     Form 3210 1/01

Exhibit Z, pg 4 of 4